Filed 12/21/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JEREMY HOWARD,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY GOLDBLOOM, et al.,<br><br>       Defendants and Appellants. | A154298<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC17561624) |

Defendants appeal an order of the trial court denying their petition to compel arbitration. They contend the claims asserted by plaintiff Jeremy Howard arose out of his employment relationship with Kaggle, Inc. (Kaggle, or the company), of which he was president and remains a minority shareholder. We shall affirm the order.

## I.  BACKGROUND

In this action, plaintiff Jeremy Howard alleges that Kaggle's chief executive officer (CEO), Anthony Goldbloom, three other members of its board of directors (Benjamin Hamner, Ash Fontana, and Curtis Feeny), and three limited partnerships (Zetta Venture Partners I, L.P., Voyager Capital Fund IV, L.P., and Voyager Capital Founders' Fund IV, L.P. (the VC defendants)) abused their corporate power and breached their fiduciary duty to him by wrongfully diluting his interest in Kaggle's stock, transferring its value to themselves through a self-dealing transaction.

### A. Allegations of the Complaint

Goldbloom formed an Australian company, Kaggle Pty Ltd, in 2010. In 2011, he recruited Howard to invest in the Australian company and join as an employee. Howard accepted, and he invested $100,000 Australian dollars for a 10 percent share in the

1

company. Goldbloom decided to move the company to California, and in 2011, he and Howard formed Kaggle, Inc., a Delaware company.

Howard rewrote Kaggle's software platform, developed a business plan and financial model, and prepared a presentation for potential investors. The company raised $11.25 million from a group of venture capitalists (referred to in the complaint as the "Original VCs"). In recognition of Howard's contributions, Kaggle's board of directors approved the issuance of nearly half of the outstanding Kaggle common stock to Howard, with Goldbloom retaining a slight majority position. Goldbloom served as Kaggle's CEO, and Howard was the company's president and chief scientist.

The company suffered business setbacks under Goldbloom's leadership, and the Original VC's told Goldbloom in June 2013 that they wanted him to step down as CEO. Goldbloom persuaded the company's board of directors to terminate Howard's employment instead, and Howard ceased working for Kaggle in August 2013.

The company's financial troubles increased, and by February 2015, it was "on the brink of collapse." In debt and almost out of money, the company needed fresh capital. Defendants devised a scheme in 2015 by which Kaggle increased its issued and outstanding stock tenfold, thus diluting the value of the existing common stock, without compensation to the minority shareholders. Defendants used the newly issued shares to pay off the Original VC's, and divided the remainder among themselves. They caused Kaggle to increase the stock option pool available to management from 8.14 percent to 37.26 percent of Kaggle stock, in order to mitigate the effects of the common stock dilution.[1]

Defendants arranged a merger with Google in 2017. Goldbloom told an investor, Nicholas Gruen, that Google would pay $60,000,000 for Kaggle, and that Google had been chosen from two other potential suitors, including Amazon. Gruen said the price

---

[1] With his opposition to the petition to compel arbitration, plaintiff submitted evidence that he suggests shows Goldbloom and other members of Kaggle's management acted in bad faith in arranging the financing in a manner that diluted the value of the company's shares.

seemed low in light of the other companies' interest, and Goldbloom agreed Kaggle could probably get more but said he wanted the deal. The final terms of the merger deal provided that Google paid approximately $47,900,000, plus an additional $10,000,000 in "stay bonuses" to members of management. Goldbloom and Hamner received "stay bonuses" of $3,000,000 each, and "closing bonuses" equal to half the value of the stock options they had recently received as if the merger had accelerated the vesting of those options. Plaintiff alleged the stay bonuses and closing bonuses were a "blatant diversion of merger consideration from the minority shareholders." Howard's share of the merger proceeds was a little more than $700,000.

Based on these allegations, Howard and Gruen pled causes of action for breach of fiduciary duty against Goldbloom, Hamner, Fontana, and Feeney; and aiding and abetting breach of fiduciary duty, unjust enrichment, and constructive trust against all defendants. Gruen later dismissed his claims with prejudice.

### B. Petition to Compel Arbitration

Defendants petitioned to compel arbitration of the claims asserted in the complaint and to stay proceedings in this action on the ground that Howard had signed four separate agreements in which he consented to arbitrate disputes related to Kaggle. Three of the agreements were signed in October 2011, when Howard became employed by Kaggle, and the fourth was a separation agreement executed in October 2013, after Howard's employment ended.

The trial court denied the petition, concluding that the arbitration clauses in the four agreements "go to the terms and interpretation of those agreements and matters released by them. Those employment-related agreements preceded by years the issues pled in the complaint, which do not regard Howard's employment." This timely appeal ensued.

## II. DISCUSSION

### A. Legal Principles

" 'California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration.' [Citation.] It

3

is the party opposing arbitration who bears the burden to show the arbitration provision cannot be interpreted to cover the claims in the complaint. [Citations.] There is no public policy, however, that favors the arbitration of disputes the parties did not agree to arbitrate." (*Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890 (*Aanderud*).) Thus, "no dispute may be ordered to arbitration unless it is within the scope of the arbitration agreement." (*Titolo v. Cano* (2007) 157 Cal.App.4th 310, 317.)

" '[T]he decision as to whether a contractual arbitration clause covers a particular dispute rests substantially on whether the clause in question is "broad" or "narrow." ' [Citation.] 'A "broad" clause includes those using language such as "*any claim* arising from or *related to* this agreement." ' [citation] or ' "arising in connection with" the agreement' [citation]. 'It has long been the rule in California that a broadly worded arbitration clause . . . may extend to tort claims that may arise under or from the contractual relationship. "There is no requirement that the cause of action arising out of a contractual dispute must be itself contractual. At most, the requirement is that *the dispute must arise out of the contract.*" ' " (*Rice v. Downs* (2016) 248 Cal.App.4th 175, 186 (*Rice*); accord *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684-686 [arbitration required where hospital's complaint was based on insurer's refusal to renegotiate reimbursement rates provided for in contract].) Put another way, "[f]or a party's claims to come within the scope of such a clause, the factual allegations of the complaint 'need only "touch matters" covered by the contract containing the arbitration clause.' " (*Ramos v. Superior Court* (2018) 28 Cal.App.5th 1042, 1052.) Broad arbitration clauses are interpreted to apply to extracontractual disputes between the contracting parties, " 'so long as they have their roots in the relationship between the parties which was created by the contract.' " (*Khalatian v. Prime Time Shuttle, Inc.* (2015) 237 Cal.App.4th 651, 660 (*Khalatian*), quoting *Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1003.) In deciding whether a dispute has its roots in the relationship created by the contract, we "examine[] the nature of the agreement and of the claims and their relationship to one another . . ." (*Rice*, at p. 188.)

4

In contrast, narrow clauses requiring arbitration of claims " 'arising from' or 'arising out of' an agreement, i.e., excluding language such as 'relating to this agreement' or 'in connection with this agreement,' are 'generally considered to be more limited in scope' " (*Rice*, *supra*, 248 Cal.App.4th at p. 186), and "have generally been interpreted to apply only to disputes regarding the interpretation and performance of the agreement." (*Ramos*, *supra*, 28 Cal.5th at p. 1052.)

We apply ordinary state-law contract principles when we determine whether the parties agreed to arbitrate a dispute, construing the arbitration agreement to give effect to the intention of the parties. (*Aanderud*, *supra*, 13 Cal.5th at p. 890.) Because there is no conflicting evidence, we review the trial court's determination de novo. (*Ibid*.)

## B. The Arbitration Provisions

With these principles in mind, we examine the terms of the four agreements and consider whether they apply to this dispute.

### 1. 2011 Employment Agreement

In 2011, Howard entered into an employment agreement with Kaggle. The agreement included terms regarding the scope of his employment, his compensation, and the termination of his employment. It included the following arbitration clause: "In consideration of [Howard's] employment with the Company, the Company's promise to arbitrate all employment-related disputes, and [Howard's] receipt of the compensation, pay raises, and other benefits paid to [Howard] by the Company, at present and in the future, [Howard] agrees that any and all controversies, claims or disputes with anyone (including the Company and any employee, officer, director, shareholder or benefit plan of the Company, in their capacity as such or otherwise), arising out of, relating to, or resulting from [Howard's] employment with the Company or the termination of [Howard's] employment with the Company, including any breach of this agreement, shall be subject to binding arbitration . . . ."[2]

### 2. 2011 CIIAA

_____

[2] This clause and the arbitration clauses in the other three agreements, as well as the titles of the agreements, were printed in all capital letters. We omit the capitalization.

Howard entered into an "At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement" (the CIIAA) in 2011. In the CIIAA, he acknowledged that his employment was at-will, agreed to keep certain information confidential, and assigned to Kaggle the rights to his inventions. This agreement contained an arbitration clause that was almost identical to that in the 2011 employment agreement, requiring arbitration of "any and all controversies, claims or disputes with anyone . . . arising out of, relating to, or resulting from my employment with the company or the termination of my employment, including any breach of this agreement . . ."

### 3. 2011 Common Stock Repurchase Agreement

In 2011, Howard also entered into a "Common Stock Repurchase Agreement" (stock agreement). The stock agreement recited that Howard was the beneficial owner of 4,452,055 shares of Kaggle's common stock and that, at the behest of purchasers of some of the Company's preferred stock, Howard would enter into an agreement allowing the Company to repurchase some of his shares under certain conditions. Under the stock agreement, the Company had an option to repurchase 3,339,041 of Howard's shares in the company (the "restricted shares") at a fixed price if he ceased working for the Company, but each month after the agreement went into effect that he worked for the Company, one thirty-sixth of the restricted shares would be released from the repurchase option. The stock agreement also provided that, with certain exceptions, Howard could not transfer the restricted shares until they were released from the repurchase option. The restricted shares were to be held in escrow until the expiration of the Company's option to purchase the restricted shares. While they were held in escrow, Howard retained the rights to vote the shares or receive cash dividends or distributions declared on them. The stock agreement contained an arbitration clause providing: "Any and all controversies, claims, or disputes arising out of, relating to, or resulting from this Agreement shall be subject to the arbitration provisions set forth in the Employment Agreement."

### 4. 2013 Separation Agreement and Release

6

After Howard's employment was terminated in 2013, he signed a "Separation Agreement and Release" (the separation agreement). The agreement recited that the parties wished to resolve "any and all disputes, claims, complaints, grievances, charges, actions, petitions, and demands that [Howard] may have against the Company and any of the Company Releasees as defined below, including, but not limited to, any and all claims arising out of or in any way related to [Howard's] employment with or separation from the Company." As "Consideration," Kaggle agreed to continue paying Howard's base salary and health benefits for four months, and accelerated the vesting date of some of the restricted shares that had not yet been released under the stock agreement. The parties also agreed on how to determine the number of shares in which he was entitled to be vested. Howard agreed to release Kaggle from all claims "relating to any matters of any kind, whether presently known or unknown, suspected or unsuspected, that [Howard] may possess against any of the Company Releasees arising from any omissions, acts, facts, or damages *that have occurred up until and including the Effective Date of this Agreement*, including, without limitation: [¶] a. any and all claims relating to or arising from [Howard's] employment relationship with the Company and the termination of that relationship; [¶] b. any and all claims relating to, or arising from, [Howard's] right to purchase, or actual purchase of shares of stock of the Company, including, without limitation, any rights under an Equity Arrangement dated October 25, 2011 between [Howard] and Anthony Goldbloom, claims for fraud, misrepresentation, breach of fiduciary duty, breach of duty under any applicable state corporate law, and securities fraud under any state or federal law . . ." (Italics added.)

The separation agreement included an arbitration clause, under which the parties agreed "that any and all disputes arising out of the terms of this agreement, their interpretation, and any of the matters herein released, shall be subject to arbitration . . ."

It also included an integration clause providing: "With the exception of the CIIAA and the Stock Agreements, this Agreement represents the entire agreement and understanding between the Company and [Howard] concerning the subject matter of this Agreement and [Howard's] employment with and separation from the Company and the

7

events leading thereto and associated therewith, and supersedes and replaces any and all prior agreements and understandings concerning the subject matter of this Agreement and [Howard's] relationship with the Company including the Employment Agreement."

## C. The Dispute Does Not Fall Within the Arbitration Agreements

We may quickly narrow the scope of the issues before us. Two of the arbitration clauses are clearly inapplicable to this dispute. The 2011 employment agreement is no longer operative: the 2013 separation agreement expressly "supersedes and replaces . . . the Employment Agreement" executed in 2011. And the separation agreement's arbitration provision is relatively narrow; it requires arbitration only of disputes "arising out of the terms of this agreement, their interpretation, and any of the matters herein released." (See *Rice*, *supra*, 248 Cal.App.4th at p. 186.) None of Howard's claims arise from the terms or interpretation of the separation agreement. And the only matters released in the separation agreement are those "that have occurred up until and including the Effective Date of this agreement." The wrongs Howard alleges took place in 2015, well after the October 9, 2013 effective date of the separation agreement.

The arbitration clauses in the stock agreement and the CIIAA are broader. The stock agreement requires arbitration of "[a]ny and all controversies, claims, or disputes arising out of, relating to, or resulting from this Agreement." The CIIAA's arbitration clause on its face is broader still, covering any and all claims "arising out of, relating to, or resulting from *my employment with the Company*." We must consider, then, whether this dispute arises out of, relates to, or results from either the stock agreement—under which Howard agreed to sell a steadily-decreasing amount of stock to the Company if he left within three years—or his employment with Kaggle. The operative question is whether his claims " 'have their roots in the relationship between the parties which was created by the contract.' " (*Khalatian*, *supra*, 237 Cal.App.4th at p. 660; *Rice*, *supra*, 248 Cal.App.4th at p. 188.)

Defendants contend Howard's claims are rooted in his employment relationship with Kaggle because he possesses the majority of his shares as a result of his employment with, and separation from, the company. That is, he received many of the shares as

8

compensation, and his right to retain possession of some of them was "[a]ccelerat[ed]" by the separation agreement. Defendants draw our attention to several cases that they argue support their position.

The plaintiff in *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1315, alleged it agreed to invest in a company in reliance on representations made by its officers, directors, and employees. The parties entered into a contract setting out the terms of their working relationship, under which the plaintiff would provide capital and services in return for an equity interest in the company. (*Ibid*.) The contract included an arbitration clause covering " '[a]ny dispute or other disagreement arising from or out of' " the agreement. (*Id*. at p. 1317.) The following year, defendants diverted the company's primary asset, a software program, to their own use. (*Id*. at pp. 1315-1316.) The plaintiff brought an action alleging defendants fraudulently induced him to invest in the company, breached their fiduciary duties, interfered with the contract between plaintiff and the company, and converted the company's property. (*Id*. at pp. 1314, 1317.) The appellate court concluded the matter was subject to the arbitration clause: the contract established and governed the plaintiff's relationship with the company, and plaintiff alleged defendants fraudulently and negligently induced it to enter into the agreement. (*Id*. at p. 1325.) The breach of fiduciary duty causes of action also hinged on the contract, which was the vehicle for investment in the company. And the cause of action for interference with contractual relations was based on contractual rights and obligations that existed because of the contract. (*Id*. at p. 1325.) Thus, all the disputes depended on the contract: plaintiff would not have entered into it but for defendants' fraudulent inducement and deceit, and the disputes would not have arisen if plaintiff had not entered into the contract with the company. (*Id*. at p. 1326.) But the contract was more than the but-for cause of the dispute. It was the vehicle that created and embodied the obligations that were the subject of the action, which, as we shall see, is a dispositive difference from the contracts in this case.

Other cases defendants cite apply similar reasoning in the context of employment contracts. An employment agreement in *Vianna v. Doctors' Management Co.* (1994)

9

27 Cal.App.4th 1186, 1188 (*Vianna*) required arbitration of " 'any dispute of any kind whatsoever, regarding the meaning, interpretation or enforcement of the provisions of this Agreement.' " The plaintiff was forced to resign after being accused of making sexual advances to another employee's husband. (*Id*. at p. 1188.) He brought an action for termination in violation of public policy, breach of the implied covenant of good faith and fair dealing, negligent infliction of emotional distress, and defamation based on events surrounding the termination of his employment. (*Ibid*.) This division concluded his claims were subject to the arbitration clause because they were all "rooted in the employment relationship created by their contract." (*Id*. at pp. 1188-1190.) The claim for breach of the covenant of good faith and fair dealing "plainly" concerned " 'enforcement' " of the contract, and the other claims all involved duties that were allegedly breached during the employment relationship. (*Id*. at pp. 1189-1190.) Here, on the other hand, Howard is not seeking to enforce any contractual provision, the breaches he alleges occurred well after his employment ended, and the wrongs he alleges have nothing to do with his former employment relationship. Indeed, one of the plaintiffs when this action was originally filed was Gruen, who also owned a minority interest in Kaggle but had apparently never worked as an employee of the Delaware corporation.

Following *Vianna*, the court in *Buckhorn v. St. Jude Heritage Medical Group* (2004) 121 Cal.App.4th 1401, 1406-1408, concluded an arbitration clause in an employment agreement covered claims for wrongful termination, defamation, and interference with prospective business advantage, even though some of the alleged wrongs took place after the termination. The plaintiff, a physician, was terminated from his employment with a medical group. Subsequently, the medical group informed his patients he was no longer with the group and offered to direct them to other physicians in the group. It also told them he had left the group "because of marital programs, mental problems, [or] loss of his insurance coverage, and that he was no longer practicing medicine, or that he had ' " just disappeared." ' " (*Id*. at p. 1405.) The appellate court rejected the plaintiff's argument that the arbitration provisions were inapplicable because his tort claims arose after the end of his employment, stating, "Buckhorn's temporal test

10

misconstrues the applicable standard. The issue turns on whether the tort claims are 'rooted' in the contractual relationship between the parties, not when they occurred." (*Id*. at p. 1407.) And his claims were so rooted: they were based on his expectation of future income from his patients, who had consulted him in his capacity as an employee of the defendant medical group. Thus, the employment agreement "would inform the extent of any economic interest" of Buckhorn's with which the medical group might have interfered. (*Id*. at pp. 1407-1408.) "Because [the physician] failed to demonstrate his tort claims were 'wholly independent' of the employment agreement," the court concluded his claims must be submitted to arbitration. (*Id*. at p. 1408.)

The dispute here is not similarly rooted in Howard's employment relationship with Kaggle. It is true that the complaint includes allegations about events that occurred while Howard worked for the Company. But these allegations are nothing more than historical background. Howard has already released Kaggle from *all* claims "known or unknown, suspected or unsuspected, that [Howard] may possess against" Kaggle or the other releasees protected by the 2011 Separation Agreement "that have occurred up until and including the Effective Date of [that] Agreement. That had the effect of wholly changing his status vis-à-vis Kaggle. Except for certain narrowly circumscribed areas, which were carved out—and are not at issue here—the parties extinguished every vestige of an employment relationship, putting all disputes and potential disputes behind them. Unlike the plaintiff's economic interests in *Buckhorn*, the harm Howard suffered is not measured by or dependent on the terms of his employment.

Howard's claim is instead rooted in, and any harm he suffered is measured by, his rights as a company stockholder. The dispute is whether defendants wrongfully diluted the value of his shares, breached their fiduciary duties to Howard as a minority stockholder, and unjustly enriched themselves at his expense. Defendants' fiduciary duties to minority shareholders and alleged wrongs exist independently of any employment relationship between Howard and Kaggle. (See *Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 509 [corporate officers and directors stand in fiduciary relation to corporation and stockholders]; *Gantler v. Stephens* (Del. 2009)

11

965 A.2d 695, 698, 708-709 [same]; *Nasrawi v. Buck Consultants LLC* (2014) 231 Cal.App.4th 328, 343 [elements of aiding and abetting breach of fiduciary duty]; *RBC Capital Mkts., LLC v. Jervis* (Del. 2015) 129 A.3d 816, 861 [same].) Any minority shareholder, whether or not the person had ever been employed at Kaggle, could bring the same claims.

Defendants lean heavily on the fact that Howard received much of his company stock as compensation for his employment with, and separation from, the company. But Howard's former employment status, and the circumstances under which he received his shares or gained the right to retain them, do not affect defendants' independent obligations not to breach their fiduciary duties to him or to aid and abet such a breach. Defendants would have owed Howard the same duty if he had acquired the stock in a completely different manner, for example by purchasing it from a third party, or if the only shares he owned were those he acquired before he began working for the Company. Defendants do not dispute that Howard was a minority shareholder of Kaggle before he became an employee; that is, the obligations allegedly breached pre-exist Howard's employment relationship. And if Howard were to transfer some of his shares to a third party who had never signed an arbitration agreement—as the stock agreement explicitly contemplates—the Company's fiduciary duties to those minority shareholders would surely exist to the same extent and in the same manner as those duties extend to Howard.

Moreover, defendants' argument—that the dispute is arbitrable because Howard received some of the stock as compensation—proves too much. As an illustration, an employee might receive a salary and put the money into an investment account before leaving his employment. If his former employer fraudulently gained access to his account two years later and looted it, no reasonable person would argue that an action to recover that money was one rooted in the employment relationship simply because the money in the account came from the employee's salary. The fact that the compensation at issue here was stock rather than cash strikes us as a distinction without a difference. Howard does not contend the shares were defective in any way when he received them; rather, he claims defendants later diluted their value.

12

This conclusion is bolstered by the limited scope of the stock agreement and the CIIAA. The stock agreement provided for the sale of Howard's restricted shares to the company in the event he ceased working for it, and gradually gave him the right to *retain* his ownership in the shares he already owned. Its arbitration clause contemplated arbitration of disputes "arising out of, relating to, or resulting from *this agreement*." (Italics added.) There is no plausible argument that the present dispute is rooted in a relationship created by the stock agreement or that the dispute arose out of his agreement that the Company could repurchase some of his shares if he left its service within 36 months. (See *Rice*, *supra*, 248 Cal.App.4th at pp. 186, 188.) Nor is this a dispute about whether the number of shares Howard received, at the time they were originally issued to him, had been improperly calculated, which is exactly the kind of claim Howard released away in 2013.

The CIIAA has a broader reach, but not an unlimited one. It recited that Howard's employment was at-will and could be terminated at any time, obligated him to keep company information confidential, and assigned his inventions to the company. The current dispute is not rooted in the at-will nature of his employment relationship, the Company's confidential information, Howard's inventions, or any obligations created by the CIIAA. It is true that the CIIAA's arbitration clause is worded broadly, reciting that the parties would arbitrate all disputes "arising out of, relating to, or resulting from [Howard's] employment with the company or the termination of [his] employment with the company." But as we have already explained, this dispute is based on obligations owed to minority shareholders in the company, obligations that are independent of Howard's employment relationship and hence not subject to arbitration even under a broad understanding of the CIIAA's arbitration clause.

Because we reach this conclusion, we need not consider Howard's alternate contention that the VC defendants, Fontana, and Feeny lack standing to compel arbitration because they are non-signatories to the arbitration agreements.

### III. DISPOSITION

The order denying the petition to compel arbitration is affirmed.

13

_____
Tucher, J.

We concur:


_____
Streeter, Acting P.J.


_____
Lee, J.[*]


_____
[*] Judge of the Superior Court of California, City and County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*Howard v. Goldbloom* (A154298)

14

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Hon. Richard B. Ulmer, Jr. |
| Counsel for Appellants: | Wilson Sonsini Goodrich & Rosati, P.C. Ignacio E. Salceda, David A. McCarthy, Drew Liming |
| | Taylor & Patchen, LLP Jonathan A. Patchen, Daniel P. Martin |
| Counsel for Respondents: | Valle Makoff LLP Jeffrey T. Makoff, Timothy A. Miller |