Filed 3/28/23  Kwie v. San Jose Water CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| LONG KWEI, Individually and as Trustee, etc., et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>SAN JOSE WATER COMPANY,<br><br>Defendant and Respondent. | H050233<br>(Santa Clara County<br>Super. Ct. No. 22CV396283) |

Appellants Long Kwei and Huey-Lin Kwei, both individually and as trustees of the Long Kwei and Huey-Lin Kwei Revocable Trust dated August 31, 2011 (collectively, the Kweis), appeal from the trial court's order denying their motion to compel arbitration of their present dispute with respondent San Jose Water Company (SJWC). The dispute concerns SJWC's alleged misuse and overuse of areas within two recorded easements burdening two contiguous lots owned by the Kweis located in Saratoga, California, for a period of roughly a year and a half in 2019 and 2020, causing damage to the Kweis' property both within and beyond the easements. During this period, SJWC constructed its Pike Road Reservoir Tank Replacement Project (the Project) on its adjacent property and used the Kweis' driveway, which appears

from the record to be roughly within the easement areas, for prolonged and continuous access and use by construction and heavy-equipment vehicles on their way to and from the Project site, five days per week.

The parties had entered into a Road Maintenance and Repair Agreement (Agreement) in 2015 affecting the Kweis' driveway, which Agreement included an arbitration clause but nowhere mentioned the easements or their properly delineated use and scope. Nor did the Agreement address SJWC's access rights over the Kweis' property for ingress and egress, instead focusing solely on the respective and newly established payment obligations for regular maintenance and repair of two specified portions of the Kweis' driveway, the first portion by both sides and the second by SJWC alone. The trial court concluded that the scope of the Agreement and its arbitration provision did not include the Kweis' present claims, which are pleaded in causes of action for nuisance, trespass, negligence, forfeiture of easement, and declaratory relief. As pleaded, the claims are all rooted in the grants of easements and SJWC's use, and alleged misuse and overuse thereof, during SJWC's construction of the Project, and not in the later Agreement containing the arbitration clause.

Finding no error, we affirm the order.

STATEMENT OF THE CASE

I.    *Factual Background*

The Kweis became the owners of their real property, consisting of two contiguous lots in a cul-de-sac located in a hillside area in Saratoga, in 1994. The property is located on Toll Gate Road, and it was and remains encumbered by two easements benefitting SJWC, which owns an adjacent lot, historically the site of a water tank. The two grants of easement were recorded with the County Recorder in 1982. One easement is described as a "20 foot Ingre[s]s Egress Easement" and the other is described as a "Slope Easement." Both

2

easements burden both Kwei lots and are described as granting "[t]he right and privilege of excavating for and laying pipeline as and when and as often as the same may be desirable in the opinion of [SJWC], together with all fittings, connections, and appliances which [SJWC] may desire to install in connection therewith, for the transmission and distribution of water, and also the right of maintaining, using, and replacing and/or enlarging the same for such purposes, and also the right and privilege of relaying, repairing, removing, and/or renewing the same, using pipe, fittings, connections and/or appliances either of the same size or sizes as may first be installed or of any other size or sizes, and also a right of way and right to construct, maintain and use a paved roadway along the same, upon, in, through, along, and across the following described land . . . [legal description of the Kwei properties]." Both recorded easements provide that the "respective rights, covenants, and conditions contained herein shall inure to the benefit of and be binding upon the heirs, successors, and assigns of the parties [t]hereto."

The Kweis "have a private driveway of approximately 650 feet that connects the cul-de-sac of Toll Gate Road with the[ir] house (the 'First Portion'), and a further driveway of about 450 feet that extends from [their] house to a gated entrance of the Pike Road Reservoir property owned by SJWC, where a water tank is situated (the 'Second Portion'). The entire First Portion [of the driveway] is on [the Kwei] property and it was completely repaved in 2015. Only [about] 120 feet (out of the 450 feet) of the Second Portion is on [their] property, and the rest is on a neighbor's and SJWC's property[.] . . . [T]he Second Portion has not been repaved since [the Kweis] purchased the two lots in 1994."

SJWC uses the driveway on the Kwei property "under the Easements to access its Pike Road Reservoir property." The parties negotiated for some

3

12 years about their respective obligations for regular maintenance and repair of the driveway before they entered into the written Road Maintenance and Repair Agreement, drafted by SJWC, on February 5, 2015. The Agreement is expressly intended "to achieve the objective of maintaining and repairing a portion of private driveway extending approximately one thousand and one hundred feet (1,100) in a westerly direction from the cul-de-sac of Toll Gate Road to the gated entrance of SJWC's real property (the "Driveway Property") . . . . The road surface subject to maintenance or repair under this Agreement shall be the commonly traveled surface only as described in paragraph 2(a) below." (Initial caps omitted.)

Before getting to paragraph 2, the Agreement in paragraph 1 describes the "scope of maintenance and repair" contemplated. (Capitalization & boldface omitted.) It provides in part that the "[p]arties [will] be equally responsible for the *routine maintenance of the road surface* over the portion of the Driveway Property for which they are 50 percent (50%) responsible . . . as described in paragraph 2(a) below (the 'First Portion'). . . . *In addition to routine maintenance, the parties shall also be equally responsible for completing all repairs reasonably required to be made on the First Portion of Driveway Property in order to have it remain serviceable and safe. . . .* [¶] SJWC shall maintain and repair the portion of the Driveway Property described in paragraph 2(b) below in its sole discretion." (Italics added.)

Paragraph 2 the Agreement addresses the "cost of maintenance or repair" (capitalization & boldface omitted) and provides that "[t]he Parties shall share in the cost of the *maintenance and repair*" as described in subparagraphs 2(a) and 2(b). (Italics added.) Paragraph 2(a) provides that "[f]or the Driveway Property from the cul-de-sac of Toll Gate Road westerly, approximately six hundred and fifty feet (650') to the westerly most driveway entrance to lot 17,

4

the parties shall split the cost of maintenance or repair fifty percent (50%) to Kwei Revocable Trust and fifty percent (50%) to SJWC." (Capitalization omitted.) Paragraph 2(b), in contrast, provides that "[f]or the Driveway Property extending from the end of the Driveway Property described in Paragraph 2(a) westerly, approximately four hundred and fifty feet (450') to the gated entrance of SJWC's Pike Road Reservoir property, SJWC shall be responsible for one hundred percent (100%) of the cost of maintenance or repair."

The "Driveway Property" from aerial view is depicted on Exhibit A to the Agreement, shown here:



Paragraph 4 of the Agreement addresses dispute resolution. It provides in pertinent part (in all caps, omitted here) that "any dispute *arising out of or in any way related* to this Agreement shall be resolved through alternative dispute resolution ('ADR') . . . first by mediation and if not successful, then by arbitration . . . ." (Capitalization & boldface omitted, italics added.) It goes on to specify the procedural mechanisms and terms for ADR under the Agreement, the powers of the arbitrator, the type of relief available, and the manner by which the parties will bear associated attorney fees and costs.

Paragraph 7 of the Agreement is an integration clause affecting the application of the parol evidence rule in construing the document; paragraph 9 provides that the Agreement is binding on the parties' respective successors and assigns; and paragraph 10 provides for the Agreement to be recorded in the official records of Santa Clara County. The Agreement was fully executed and recorded on February 11, 2015. It nowhere mentions or references either of the two easements that burden the Kweis' property and benefit SJWC's property, or their proper scope and use, or any rights or obligations related thereto. But, according to Long Kwei, the Kweis' "private driveway," which is the subject of the Agreement, "appears subject to the easements," meaning physically located, at least in some part, within one or both of them.[1]

---

[1] This appearance of physical overlap between the Kweis' driveway and the easements, at least as to the First Portion of the Kwei driveway beginning at Toll Gate Road, and the 20-foot access easement, is also suggested by a comparison of the picture above, attached to the Agreement, with the depiction of the easements drawn on Exhibit A to the grant of the "20 foot Ingre[s]s Egress" easement. But no precision as to this suggested physical overlap between the Kweis' driveway and the easements, which was not disputed by SJWC, was established below. The trial court's order noted in its "Background" section that for SJWC to access its adjacent property, and specifically for the Project, it "used a road which included a portion of a driveway owned by [the Kweis on] which [SJWC] has an easement for" ingress and egress.

According to Long Kwei's declaration filed in support of their motion to compel arbitration, "[f]rom approximately April 2019 until September 2020, for its reservoir tank replacement project, SJWC caused heavy machinery and trucks to pass through [the Kweis'] driveway 9-5 every weekday. SJWC did not obtain [the Kweis'] consent. Nor did it even notify [them] before the construction began." Further, "[t]he frequent traffic with the noise and vibrations annoyed [the Kweis] and disturbed [their] quiet enjoyment of [their] lives. In addition, on or about June 09, 2020, a manlift emitted sparks and caused a brushfire. The fire grew very rapidly, and it was only yards away from the [Kweis'] house before a crew member put it down with [their] garden hose. Nonetheless, the fire destroyed the [Kweis'] irrigation system and the grassland of approximately 500 square feet [on their property]. The fire also killed a small oak tree and burned the lower branches of two larger oak trees. [The Kweis] were terrified by the accident."

The Project generally involved SJWC replacing the old water tank on its adjacent Pike Road property with a bigger one, and the "installation of a permanent pad for three temporary tanks and repaving the site to improve access around the tank for routine operations and maintenance." From Long Kwei's perspective, "[w]hen the construction project concluded in September 2020, the driveway was completely ruined. The excessive traffic of heavy vehicles and machinery furrowed the driveway, leaving many potholes, cracks, and rugged surfaces. Without discussing [it] with [the Kweis], SJWC did only superficial patch-up work on the two most damaged areas[;] one is about 150 square feet (6' x 25') [in size] and another about 25 square feet. Both [repairs] were of poor workmanship. Also, [SJWC] repaired a curb of approximately 3 feet broken by a long-bed truck (when the driver tried to make turns[)][.] But other potholes and cracks and the uneven surface were left

7

unattended. [¶] . . . Thus, SJWC caused a brushfire, damaged the driveway, and disturbed [the Kweis'] quiet enjoyment of [their] property. A controversy arose as the parties disputed the scope of the easements, the costs of the maintenance and repairs of the driveway, and the liability and damages for [the Kweis'] tort claims of trespassing, nuisance, negligence, and forfeiture of the [e]asements."

From "April 2021 until October 2021, [the Kweis' counsel] tried to negotiate with [SJWC] and to resolve the parties' dispute through mediation and arbitration . . . ." Counsel wrote to SJWC on April 28, 2021, and "invoke[d] the mediation and arbitration process stipulated in" the Agreement. Informal settlement discussions took place in the following months but nothing was resolved. By letter dated May 17, 2021, the Kweis' counsel demanded that SJWC "(1) repave the driveway, (2) compensate the Kwei family for the damages caused by the June 09, 2020 fire, and (3) compensate the Kwei family for the damages caused by . . . SJWC's trespassing." Counsel for the Kweis again "invoke[d] the mediation and arbitration process stipulated in" the Agreement by e-mail on September 8, 2021, and then again by letter to counsel for SJWC on September 23, 2021.

SJWC ultimately agreed to participate in mediation, which occurred in December 2021, but that effort was unsuccessful in resolving the Kweis' current claims. None of the written correspondence from SJWC's counsel in response to the Kweis' counsel's invocation of the ADR provisions of the Agreement to initiate the mediation contested the applicability of the Agreement's ADR provision to the Kweis' claims. But counsel for SJWC later declared in opposition to the motion to compel arbitration that "throughout [the] settlement discussions, [she had] noted that it was questionable whether the arbitration provision even applied to the dispute." The Kweis' counsel denied this factual assertion that SJWC had questioned the applicability of the Agreement's ADR

8

clause to the dispute before and during the mediation. He declared that SJWC did not contest the scope of the Agreement's ADR clause until after the mediation had unsuccessfully concluded, and did so only in response to the Kweis' later demand for arbitration under the Agreement, described next and for which mediation was a prerequisite under the ADR provision.

After the unsuccessful mediation, on December 27, 2021, the Kweis' counsel sent a written demand for arbitration to SJWC's counsel, again "invok[ing] the arbitration clause" of the Agreement. On January 18, 2022, SJWC's counsel replied to the Kweis' counsel, and expressly disputed the applicability of the Agreement and its ADR provision to the "present controversy." The proffered justification was that the Kweis were not seeking "any performance or alleg[ing] any breach of the Agreement. By its explicit terms, [each party is] responsible for fifty percent (50%) of any repair and maintenance costs for the first six hundred fifty feet (650') of driveway. Here, [the Kweis] are seeking that SJWC pay for one hundred percent (100%) of the repair costs for the driveway based on the allegation that SJWC was using the driveway in violation of the June 21, 1982[] Right of Way Easement that grants SJWC a twenty-foot ingress/egress easement over the property that is now owned by [the Kweis]. [¶] The remainder of [their] claims relate to (1) fire damage alleged to have been caused by SJWC subcontractor . . . ; and (2) alleged trespass damages relating to the June 21, 1982[] Right of Way Easement. None of these claims relate in any way to the Agreement and are therefore not covered by the arbitration provision contained therein."

Because of this impasse, the Kweis indicated they would imminently pursue litigation and seek judicial relief to compel arbitration.

9

## II. *Procedural Background*

The Kweis filed their complaint in the superior court on March 22, 2022. They seek damages and other relief on pleaded causes of action for private nuisance, trespass, negligence, forfeiture of easement, and declaratory relief. The complaint's general allegations plead the existence and terms of SJWC's two easements burdening the Kwei property and of the Agreement. They further plead facts concerning SJWC's construction of the Project giving rise to the pending dispute—namely SJWC's prolonged use and alleged misuse and overuse of the Kweis' driveway with heavy equipment and materials for construction purposes related to the Project, including causing a fire on the Kweis' property, with resulting damages and the Kweis' loss of quiet enjoyment during the period of such use by SJWC in 2019 and 2020.

None of the causes of action plead a breach of, or sought to enforce or interpret, the Agreement containing the arbitration provision, including its respective payment obligations for routine repair and maintenance of the relevant portions of the Kweis' driveway. But the general allegations plead that because the Agreement was recorded and purports to run with the land and bind the Kweis' successors in interest, it "is essentially an addendum to the [e]asements."

The prayer of the complaint seeks compensatory damages, forfeiture of the two easements or a permanent injunction enjoining SJWC's use of the easements that is incompatible with their scope, declaratory relief concerning the parties' respective rights and obligations with respect to the easements, attorney fees and costs, and such other relief as the court deems just and proper.

Concurrently with the filing of their complaint, the Kweis filed a motion to compel arbitration of the dispute under Code of Civil Procedure

10

section 1281.2 (further unspecified statutory references are to the Code of Civil Procedure).[2] SJWC answered the complaint and opposed the motion to compel arbitration. The Kweis filed a reply.

The trial court, consistently with its local practice, before the hearing issued a written tentative ruling denying the motion, which no party contested. A formal written order replicating the court's tentative ruling was later entered without oral argument or a hearing. The basis of the court's denial was its conclusion that the Agreement "does not address rights of access or use of the driveway, and is limited to the parties' respective responsibilities for routine maintenance and for the cost of maintenance and repair of the private driveway," and so "the claims and causes of action in plaintiffs' complaint do not

---

[2] The Kweis also simultaneously and timely filed a request for statement of decision under sections 632 and 1291, and rule 3.1590 of the California Rules of Court, listing four issues to be addressed, none of which included whether SJWC was estopped from denying the applicability of the Agreement's ADR clause to the Kweis' current causes of action. At least where there is an adjudication of a question of fact by the trial court in denying a petition to compel arbitration, a request for statement of decision made in the manner required by section 632 obligates the trial court under section 1291 to issue one. (*Metis Development LLC v. Bohacek* (2011) 199 Cal.App.4th 748, 755–759 (*Metis*).) The trial court did not here follow the formal process provided by rule 3.1590 of the California Rules of Court for issuing a statement of decision but issued an order denying the motion with reasons given, after issuing its tentative ruling in the same form with no party contesting it or requesting a hearing. The court's lack of compliance with rule 3.1590 of the California Rules of Court was not brought to its attention by objection or otherwise. Further, the court made no factual findings in its order, instead facially construing the Agreement and its ADR provision as a matter of law without the need for extrinsic evidence, finding them to be clear and unambiguous. (See *Allstate Ins. Co. v. Orlando* (1968) 262 Cal.App.2d 858, 867 [§ 1291 must be read in conjunction with § 632, which requires findings only upon a factual and not a purely legal adjudication].) No claim of error is made in any event based on the lack of a statement of decision, and any such issue is therefore forfeited on appeal.

11

fall within the scope of the arbitration agreement . . . " as they are "not encompassed or contemplated by" it. The court found the "express language of the [A]greement" to be "clear and unambiguous" and its ADR clause to likewise be "clear." The court thus did not resort to extrinsic evidence to construe the Agreement as excluding the present disputes from its ADR provision, and no conflicting evidence in this regard was in any event presented. Finally, the court rejected the Kweis' legal argument that the Agreement constituted an "addendum" to either grant of easement, characterizing this claim by the Kweis as "a disingenuous attempt to connect the [A]greement with its arbitration provision to the easements and the lawsuit."[3]

The order denying the motion to compel arbitration is an appealable one from which the Kweis timely appealed. (§ 1294, subd. (a).)

DISCUSSION

I. *The Standard of Review Governing the Interpretation of an Arbitration Agreement*

"Generally, the standard of review applicable to the denial of a motion to compel arbitration is determined by the issues presented on appeal [citation].

---

[3] The court did not mention or rule on the Kweis' alternative claim made under Evidence Code section 623 that SJWC is estopped from denying that the scope of the Agreement's ADR clause includes the present dispute. This claim was based on SJWC having participated in the mediation after the Kweis had expressly "invoke[d]" this requirement of the ADR clause, without disputing that the clause applied until after the mediation was concluded, thus allegedly consenting or submitting to it. The Kweis contended that they had justifiably relied on SJWC's submission to the pre-arbitration requirement of mediation, expending for it "significant time, energy, and attorney's fees and costs." But there was a factual conflict in the evidence as to whether SJWC's counsel had throughout settlement discussions, both before and during the mediation, openly questioned the ADR clause's applicability to the dispute, which goes to the Kweis' justifiable reliance, an element of estoppel as explained below.

To the extent the denial relies on a pertinent factual finding, we review that finding for the existence of substantial evidence. [Citation.] In contrast, to the extent the denial relies on a determination of law, we review the trial court's resolution de novo. [Citation.]" (*Bautista v. Fantasy Activewear, Inc.* (2020) 52 Cal.App.5th 650, 655.) "We review the trial court's interpretation of an arbitration agreement de novo when, as here, that interpretation does not depend on conflicting extrinsic evidence. (*Pinnacle [Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223,] 236 [(*Pinnacle*)]; [Citations].) [And then,] ' "[w]hether an arbitration agreement applies to a controversy is [also] a question of law to which the appellate court applies its independent judgment where no conflicting extrinsic evidence in aid of interpretation was introduced in the trial court." ' [Citations.]" (*Ahern v. Asset Management Consultants, Inc.* (2022) 74 Cal.App.5th 675, 687 (*Ahern*); see also *San Francisco Police Officers' Assn. v. San Francisco Police Com.* (2018) 27 Cal.App.5th 676, 683 (*San Francisco*); *Rice v. Downs* (2016) 248 Cal.App.4th 175, 185 (*Rice*).)

II.     *The Governing Law*

"A party to an arbitration agreement may petition the court to compel other parties to arbitrate a dispute that is covered by their agreement." (*Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 15; § 1281.2.) A court must order arbitration under section 1281.2 "if it determines that an agreement to arbitrate the controversy exists[.]"[4] Through California's detailed statutory

_____

[4] Although none are asserted or apply here, there are four limited statutory grounds under section 1281.2 for not ordering parties to arbitrate a dispute that is within the scope of their agreement to arbitrate, including waiver, rescission, and to avoid conflicting rulings on a common issue of law or fact where a party to the arbitration agreement is also a party to a pending

scheme on arbitration, the Legislature has expressed a " 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9; see *id*. at p. 10 (*Moncharsh*); § 1280 et seq.) "Doubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration. The court should order them to arbitrate unless it is clear . . . the arbitration clause cannot be interpreted to cover the dispute." (*United Transportation Union v. Southern Cal. Rapid Transit Dist.* (1992) 7 Cal.App.4th 804, 808.)

While public policy favors arbitration, " ' "there is no policy compelling persons to accept arbitration of controversies" ' " to which they have not agreed. (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744 (*Victoria*); accord, *Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653 (*Engineers*).) "[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute.*" (*Granite Rock Co. v. International Brotherhood of Teamsters* (2010) 561 U.S. 287, 297.)

Because the right to arbitration rests on contract, the existence of an agreement to arbitrate requires the mutual consent of the parties to arbitrate the particular dispute in question. (*HM DG, Inc. v. Amini* (2013) 219 Cal.App.4th 1100, 1109; *Mendoza v. Trans Valley Transport* (2022) 75 Cal.App.5th 748, 763 (*Mendoza*), citing *Moncharsh, supra*, 3 Cal.4th at pp. 8–9 ["The scope of an arbitration is a matter of agreement between the parties"].) "An arbitration agreement is tied to the underlying contract containing it, and [it] applies 'only where a dispute has its real source in the contract. The object

---

action with a third party arising out of the same transaction. (§ 1281.2, subds. (a)–(c).)

14

of an arbitration clause is to implement a contract, not to transcend it.' (*Litton Financial Printing Div. v. NLRB* (1991) 501 U.S. 190, 205.)" (*Moritz v. Universal City Studios LLC* (2020) 54 Cal.App.5th 238, 246 (*Moritz*).)

" ' "When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." ' [Citations.] An arbitration agreement is . . . construed like other contracts to give effect to the intention of the parties and the ordinary rules of contract construction apply. [Citation.] If the contractual language is clear and explicit, it governs. [Citations.]" (*Mendoza, supra*, 75 Cal.App.5th at p. 764, citing *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; Civ. Code, § 1638; see also *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 244; *In re Tobacco Cases I* (2004) 124 Cal.App.4th 1095, 1104 (*Tobacco Cases I*).) "A court must view the language in light of the instrument as a whole and not use a 'disjointed, single-paragraph, strict construction approach.' " (*Ticor Title Ins. Co. v. Rancho Santa Fe Assn.* (1986) 177 Cal.App.3d 726, 730 (*Ticor*).) "If possible, the court should give effect to every provision. (Civ. Code, § 1641; [Citation.].) An interpretation which renders part of the instrument to be surplusage should be avoided." (*Ticor*, at p. 730.) But "[n]o authority permits sending a matter to arbitration simply because the same parties agreed to arbitrate a different matter." (*Moritz, supra*, 54 Cal.App.5th at p. 246.) This is because arbitration "is a matter of consent, not coercion." (*Volt Info. Sciences v. Board of Trustees of Leland Stanford Jr. Univ.* (1989) 489 U.S. 468, 479; see also *Atkinson v. Sinclair Refining Co.* (1962) 370 U.S. 238, 241 [party cannot be required to submit to arbitration any dispute they have not agreed to so submit], overruled on another point as stated in *Boys Market, Inc. v. Retail Clerk's Union* (1970) 398 U.S. 235, 238; accord, *Pinnacle, supra*, 55 Cal.4th at p. 236.)

15

"Thus, the policy favoring arbitration ' "does not override ordinary principles of contract interpretation." . . . "[T]he terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested." ' " (*Vaughn v. Tesla, Inc.* (2023) 87 Cal.App.5th 208, 218 (*Vaughn*).)

Nor, as some cases might suggest, do we view the general policy in favor of arbitration as inverting the normal burden of proof applicable to a party seeking affirmative relief from the court. The Kweis contend that SJWC bore the affirmative burden of proving that the Kweis' underlying claims are excluded from the ADR clause of the Agreement, once they met the threshold of proving the existence of an agreement between the parties to arbitrate. The trial court appears to have agreed with this allocation, albeit while concluding that SJWC "met its burden of proof to show that the claims and causes of action in [the Kweis'] complaint do not fall within the scope of the arbitration [provision] contained in the" parties' Agreement. There is case law to support this position as to the allocation of the burden of proof. But Courts of Appeal have arrived at different conclusions as to who bears the burden to prove that the dispute is either within or outside the scope of the arbitration agreement once it is established that such an agreement exists between the parties.

For example, some courts have held that "[b]efore a party may be compelled to arbitrate a claim, the petitioning party has the burden of proving the existence of a valid arbitration clause and [that] the dispute is covered by the agreement." (*Larian v. Larian* (2004) 123 Cal.App.4th 751, 760; see also *San Francisco Police, supra*, 27 Cal.App.5th at p. 683 ["The party requesting arbitration bears the burden of proving the existence of an agreement to arbitrate a particular controversy."].)

16

Other courts have placed the burden of proof on "the party opposing arbitration to demonstrate that an arbitration clause cannot be interpreted to require arbitration of the dispute." (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 686–687 (*Coast Plaza*); accord *Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890 ["It is the party opposing arbitration who bears the burden to show the arbitration provision cannot be interpreted to cover the claims in the complaint."]; *Howard v. Goldbloom* (2018) 30 Cal.App.5th 659, 663 (*Howard*) [same]; *Khalatian v. Prime Time Shuttle, Inc.* (2015) 237 Cal.App.4th 651, 659 ["The party opposing arbitration has the burden to show that the agreement does not apply to the dispute."]; *Titolo v. Cano* (2007r) 157 Cal.App.4th 310, 316–317 [same]; *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1321 (*EFund*) [same]; *Buckhorn v. St. Jude Heritage Medical Group* (2004) 121 Cal.App.4th 1401, 1406 (*Buckhorn*) [same].)

After considering the cases on both sides of this question, we conclude that before a court compels the parties to arbitrate, it is the moving party who must meet the burden of proving the existence of an agreement to arbitrate the particular controversy at issue. We reach this conclusion based on our analysis of the California Supreme Court's discussion of the burden of proof for a motion to compel arbitration in *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394 (*Rosenthal*) and *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951 (*Engalla*).[5]

---

[5] No matter how the burden of proof is allocated, we ultimately conclude here that the Kweis did not show the existence of an agreement to arbitrate the claims in their complaint, and also that SJWC showed that the claims fall outside the scope of the parties' Agreement. Thus, our affirmance of the trial court's order does not turn on the allocation of the burden of proof.

17

In *Rosenthal*, our Supreme Court addressed "the procedures by which petitions to compel arbitration [under section 1281.2] are to be determined in the superior courts." (*Rosenthal, supra*, 14 Cal.4th at p. 402.) The parties opposing arbitration, there the plaintiffs, alleged that the arbitration agreements were void for fraud in the execution. (*Ibid*.) To provide trial courts with guidance on the correct procedures for deciding a section 1281.2 petition, the court said, "[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to *arbitrate the controversy*, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether [the agreement] is enforceable. Because the existence of an agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence. If the party opposing the petition raises *a defense* to enforcement—either fraud in the execution voiding the agreement, or a statutory defense of waiver or revocation (see § 1281.2, subds. (a) & (b))—that party bears the burden of producing evidence of, and proving by a preponderance of the evidence, any fact necessary to the defense." (*Id*. at p. 413, italics added.)

A year after *Rosenthal*, the Supreme Court again addressed the burden of proof for a motion to compel arbitration in *Engalla*. It reaffirmed that "[t]he petitioner bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its *defense*." (*Engalla, supra*, 15 Cal.4th at p. 972, italics added.) As in *Rosenthal*, in *Engalla*, the party resisting arbitration raised defenses to enforceability of the arbitration agreement, including fraud and waiver. (*Id*. at p. 960.) Discussing the resisting party's burden to prove a fraud defense, the

18

high court explained that "the petition to compel arbitration is not to be granted when there are grounds for rescinding the agreement. Fraud is one of the grounds on which a contract can be rescinded. [Citation.] In order to defeat a petition to compel arbitration, the parties opposing a petition to compel must show that the asserted fraud claim goes specifically ' "to the 'making' of the agreement to arbitrate," ' rather than to the making of the contract in general." (*Id.* at p. 976.)

Under the burden-shifting rules set out in *Rosenthal* and *Engalla,* the Supreme Court delineated two separate categories of issues falling under these rules: 1) the moving party bears the burden of proving the *existence* of an agreement; and 2) the opposing party bears the burden of proving any *defenses* to the arbitration agreement's enforcement. These cases make clear that the Supreme Court did not contemplate that the opposing party's burden was to affirmatively show that the agreement to arbitrate excluded the particular dispute. Rather, the opposing party's burden is to prove defenses to the enforceability of the agreement, such as fraud in the execution voiding the agreement, or a statutory defense for rescission, including waiver or revocation. Such affirmative defenses do not arise without a valid agreement to arbitrate the dispute in the first place. In other words, such defenses presuppose there is "prima facie evidence of a written agreement *to arbitrate the controversy*." (*Rosenthal, supra*, 14 Cal.4th at p. 413, italics added.) And it is the moving or petitioning party who, by statute, must allege "the existence of . . . [an] agreement to arbitrate *a controversy* and that a party to the agreement refuses to arbitrate *that controversy*." (§ 1281.2, italics added.)

Thus, we cannot conclude from the Supreme Court's discussion in *Rosenthal* and *Engalla,* and from the plain language of section 1281.2, that the moving party can meet its prima facie case to compel arbitration by simply

19

showing the existence of *any* agreement between the parties to arbitrate as opposed to an agreement to arbitrate the particular controversy at issue. Instead, a prima facie case includes a showing that the controversy is within the scope of the arbitration agreement offered.

Cases placing the burden on the resisting party to prove that the arbitration agreement excludes the controversy appear to derive from *Coast Plaza, supra*, 83 Cal.App.4th at pages 686–687. (See e.g., *EFund, supra*, 150 Cal.App.4th at p. 1321; *Buckhorn, supra*, 121 Cal.App.4th at p. 1406.) *Coast Plaza* appears to have deduced this concept from California's general policy favoring arbitration and that any doubts are to be so resolved. (*Coast Plaza, supra*, 83 Cal.App.4th at pp. 686–687.) According to the *Coast Plaza* court, under these general principles favoring arbitration agreements, "[i]t seems clear that the burden must fall upon the party opposing arbitration to demonstrate that an arbitration clause cannot be interpreted to require arbitration of the dispute." (*Ibid*.) But the court did not mention *Rosenthal* or *Engalla* or analyze this question based on their holdings.

Although California's statutory scheme favors arbitration, as we've already noted, arbitration agreements are fundamentally contracts to which the ordinary rules of contract interpretation apply. (See, e.g., *Mendoza, supra*, 75 Cal.App.5th at p. 764.) And our Supreme Court has cautioned that "judicial enthusiasm for alternative methods of dispute resolution must not in all contexts override the rules governing the interpretation of contracts." (*Victoria, supra*, 40 Cal.3d at p. 739.) As the high court has explained, "[u]nder statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Civ. Code, § 1636.]" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822.)

Thus, the core question for a court in determining whether an agreement to arbitrate exists, as with any contract, is whether the parties mutually assented to the agreement. And as we've noted, there is no public policy to compel arbitration of disputes the parties did not intend to arbitrate. (*Victoria, supra*, 40 Cal.3d at p. 744; *Engineers, supra*, 30 Cal.App.4th at p. 653.) Imposing a burden on the party opposing arbitration to prove the particular dispute at issue exceeds the scope of the arbitration agreement goes too far, favoring arbitration over what the parties intended by their contract. Because the mutual assent of the parties is paramount, the burden to prove the existence of an agreement to arbitrate the particular dispute at issue should fall on the moving party as part of its prima facie case for compelling arbitration.

Logic and common sense further support this conclusion. The Kweis contend that the mere existence of the ADR clause in the Agreement should satisfy their burden to compel arbitration, shifting the burden to SJWC to show that the dispute falls outside the scope. But taking this contention to its extreme would allow a party moving for arbitration to satisfy its burden by merely holding up *any* arbitration agreement signed by the parties, irrespective of whether the agreement is even relevant to their present dispute. It would be a near absurd prima facie case if the moving party could satisfy its burden by presenting any arbitration agreement between the parties to the court, "especially when the existence and enforceability of the agreement to arbitrate is the very issue before the trial court" on a motion or petition to compel arbitration. (*Rosenthal, supra*, 14 Cal.4th at p. 413.)

Having determined the proper allocation of the burden of proof, we now turn to the proper mode of analysis. In determining whether an arbitration provision applies to a certain controversy, we first identify the controversy and then decide whether that controversy is within the scope of the arbitration

clause. (*Tobacco Cases I, supra*, 124 Cal.App.4th at p. 1106; accord *Coast Plaza, supra*, 83 Cal.App.4th at pp. 684–685.) To identify the controversy, the court examines "the specific acts of alleged wrongdoing and not just the form of the claim." (*Drell v. Cohen* (2014) 232 Cal.App.4th 24, 29–30 (*Drell*); *Bigler v. Harker School* (2013) 213 Cal.App.4th 727, 739, 741 (*Bigler*) [inquiry focuses on an examination of the conduct and the circumstances alleged, not merely the label of the cause of action; it is the dispute, not the named cause of action, that is the focus of the inquiry].) Rather than interpreting the written contract at this step of the analysis, the court instead assesses the nature of the dispute *as pled* in the complaint. (*Tobacco Cases I, supra*, 124 Cal.App.4th at p. 1106; *Coast Plaza, supra*, 83 Cal.App.4th at pp. 684–685.)

Once the pending controversy is identified, the court turns to the parties' arbitration agreement to determine whether the identified dispute falls within its scope. " ' "[T]he decision as to whether a contractual arbitration clause covers a particular dispute rests substantially on whether the clause in question is 'broad' or 'narrow.' " ' ([*Rice, supra*, 248 Cal.App.4th at p.] 186; accord, *Howard*[*, supra*, 30 Cal.App.5th at pp.] 663–664.) A broad clause includes language that requires arbitration of ' " '*any claim* arising from or *related* to' " ' the agreement. (*Rice*, at p. 186; see, e.g., *Yuen v. Superior Court* (2004) 121 Cal.App.4th 1133, 1138 [arbitration clause stating [that] all disputes relating to contract must be submitted to arbitration was 'broad']; *Coast Plaza*[*, supra*, 83 Cal.App.4th at pp.] 684, 681 & fn. 2 [agreement to arbitrate ' "any problem or dispute" that arose under or concerned the terms of the [service agreement]' is 'clear,' 'plain,' and 'very broad,' giving rise to presumption parties intended to arbitrate claims, including tort claims, relating to the agreement].)" (*Ahern, supra*, 74 Cal.App.5th at p. 689.)

22

"A narrow clause, on the other hand, typically includes language that requires arbitration of 'a claim, dispute, or controversy "arising from" or "arising out of" an agreement, i.e., excluding language such as "relating to the agreement" or "in connection with this agreement." ' ([*Rice*,] *supra*, 248 Cal.App.4th at p. 186.) Narrow arbitration clauses are generally interpreted ' " 'to be more limited in scope' " ' (*Howard*[, *supra*,] 30 Cal.App.5th at p. 664; see *Rice*, at p. 186) and 'apply only to disputes regarding the interpretation and performance of the agreement' (*Ramos v. Superior Court* (2018) 28 Cal.App.5th 1042, 1052 [(*Ramos*)]; accord, *Howard*, at p. 664" [claims for breach of fiduciary duty to minority shareholders did not fall within scope of narrow arbitration provisions in plaintiff's employment agreements or stock repurchase agreement with defendants]). (*Ahern, supra*, 74 Cal.App.5th at pp. 689–690.)

In sum, "the inclusion of 'relating to' typically justifies applying arbitration agreements to claims that do not arise from the contract. In contrast, 'narrow clauses' stating only 'arising from' ' "have generally been interpreted to apply only to disputes regarding the interpretation and performance of the agreement" ' " (*Vaughn, supra*, 87 Cal.App.5th at p. 221.) But, even with a broad clause, there is no authority requiring arbitration of "a claim *not* rooted in the . . . relationship established by the contract containing an arbitration provision." (*Ibid.*; Civ. Code, § 1648 ["However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."].)

Thus, a " 'broad provision' " using the phrase " 'arising from or related to' " "acquires meaning [only] by considering what two things are being related to each other . . . . (*Ramos*[, *supra*, 28 Cal.App.5th at p.] 1051 ['While the phrase "arising under or related to" is very broad, it is necessarily qualified by what follows.'].) [¶] It is well[-]established . . . that when courts say that an

23

arbitration agreement including 'relating to' is broad, it typically is because it expands the reach of the agreement to encompass claims rooted in the [contractual] relationship, even if the claims do not actually arise from the . . . contract itself. As explained in *Rice*[, *supra*, 248 Cal.App.4th at p.] 186, ' "It has long been the rule in California that a broadly worded arbitration clause . . . may extend to tort claims that may arise under or from the contractual relationship. 'There is no requirement that the cause of action arising out of a contractual dispute must be itself contractual. At most, the requirement is that *the dispute* must arise out of contract.' " ' (See also *Khalatian, supra*, 237 Cal.App.4th at p. 660 [broad provisions 'are consistently interpreted as applying to extracontractual disputes between the contracting parties'].)" (*Vaughn, supra*, 87 Cal.App.5th at pp. 220–221.)

"Consistent[ly] with the proposition that 'relating to' acquires meaning from the subjects being related, the phrase normally encompasses extracontractual claims only 'so long as they have their *roots in* the relationship between the parties which was created by the contract.' (*Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1003; accord, *Khalatian, supra*, 237 Cal.App.4th at p. 660; *Howard, supra*, 30 Cal.App.5th at p. 664; *Ramos, supra*, 28 Cal.App.5th at p. 1052[; *Bigler, supra* 213 Cal.App.4th at p. 739 [that the complaint alleges torts is immaterial; what must be determined is whether the tort claims have their roots in the relationship between the parties created by the contract]].) For example, *Khalatian* held that Labor Code claims were encompassed by the arbitration agreement in that case, even though the plaintiff did not rely on the compensation provisions in his employment contract (*Khalatian,* at p. 660); *Ramos* held that statutory employment claims were within the scope of an arbitration agreement because the underlying contract was relevant to the claims in several respects (*Ramos,* at p. 1053); and *Howard*

held that a claim the defendant wrongfully diluted the value of plaintiff's shares in the company was not rooted in the contractual employment relationship (*Howard,* at p. 670)." (*Vaughn, supra,* 87 Cal.App.5th at p. 221, italics added.) Thus, mere "factual commonalities" between the arbitration agreement and the claims at issue are insufficient to stretch the scope of the agreement to include the claims "absent any indication the parties understood the agreement would apply in that manner." (*Id.* at p. 222.)

"The 'rooted in' concept for determining arbitrability applies in cases involving parties whose . . . contractual arrangements include a broad arbitration clause. Tort claims that arise from those contractual relationships— that have their roots in it—are subject to arbitration. [Citation.] As . . . explained in *Howard*[, *supra,*] 30 Cal.App.5th at page 664, 'Broad arbitration clauses are interpreted to apply to extracontractual disputes between the contracting parties, " 'so long as they have their roots in the relationship between the parties which was created by the contract.' " ' (Accord, *Rice*[,*supra,*] 248 Cal.App.4th at p. 188 ['even under a very broad arbitration provision, such as "any controversy or claim arising out of or relating to this agreement," tort claims must " 'have their roots in the relationship between the parties which was created by the contract' " before they can be deemed to fall within the scope of the arbitration provision'].)" (*Ahern, supra,* 74 Cal.App.5th at p. 692; see also *Buckhorn, supra,* 121 Cal.App.4th at p. 1407 [arbitrability with "broad" clause "turns on whether the tort claims are 'rooted' in the contractual relationship between the parties" and claims " 'wholly independent' " of the agreement are excluded from arbitration].) "In deciding whether a dispute has its roots in the relationship created by the contract, we 'examine[] the nature of the agreement and of the claims and their relationship to one another … .' (*Rice*[, *supra,* 248 Cal.App.4th] at p. 188.)" (*Howard, supra,* 30 Cal.App.5th at p. 664.)

25

III.    *The Kweis' Present Claims Do Not Fall Within the Scope of the ADR*
         *Agreement*

Applying the above analysis here, we conclude that even though the ADR clause in the parties' Agreement can be categorized as broad, the Kweis' pleaded claims are still not rooted in the Agreement. They are instead rooted in the two grants of easement, which concern and define SJWC's right of access over the Kweis' property (including outside the contours of the driveway). The easements burdened the Kweis' property when they acquired it in 1994 and they stand on their own, independent from the 2015 Agreement for routine repair and maintenance of portions of the driveway.

As noted, we start by identifying the controversy at issue, framed by the allegations in the Kweis' complaint. To refresh, its general allegations plead the existence and description of the driveway on the Kweis' property; the existence and scope of the two easements burdening the property and benefitting SJWC's adjacent property; and the existence and purpose of the Agreement, which is summarily alleged to be an "addendum" to the easements and "provides the scope and costs of maintenance or repairs of portions of [the Kweis'] driveway, which appears subject to the two [e]asements."

The general allegations proceed to describe SJWC's Project, and that to construct it, "SJWC's long-bed and flat-bed trucks tracked and wheeled heavy machinery, construction materials, and dirt, passed through [the Kweis'] driveway, 9-5 every weekday" for approximately 17 months in 2019 and 2020. "The frequent traffic with the noise and vibrations annoyed [the Kweis] and disturbed their quiet enjoyment of their lives." "In addition, on or about June 09, 2020, a manlift emitted sparks and caused a brushfire. The fire grew very rapidly, and it was only yards away from the house before a crew member put it down with [the Kweis'] garden hose. Nonetheless, the fire destroyed the

26

irrigation system and the grassland of approximately 500 square feet. The fire also killed a small oak tree and burned the lower branches of two larger oak trees. [The Kweis] were terrified by the accident." Finally, the general allegations plead that "[w]ithout discussing with [the Kweis], SJWC did only superficial patch-up work on the two most damaged areas," and "both [were] of poor workmanship." And SJWC repaired a curb, presumably on the driveway, but "other potholes and cracks and the rugged surface were left unattended."

All five causes of action reallege the prior allegations. The first cause of action for private nuisance adds that SJWC's use of the driveway for the Project was intentional, and that the "noise and vibration of machinery" was "harmful" and "obstructed the free passage of the driveway." SJWC "damaged the driveway" and "caused fire damages and resultant" "apprehension and mental anguish." "As a result, SJWC substantially interfered with [the Kweis'] use and comfortable enjoyment of their property." The second cause of action for trespass further alleges that SJWC's use of the easements for the Project exceeded their scope and purpose. The third cause of action for negligence addresses the fire damage to the Kweis' property (irrigation system, plants, and lawn) caused by a machine and damage to the driveway as a result of its prolonged use by heavy vehicular equipment and machinery related to the Project. The fourth cause of action for forfeiture of the easements alleges SJWC's misuse and overuse of the servitude, justifying their extinguishment, as well as the extinguishment of "their addendum, the Agreement." The fifth cause of action for declaratory relief alleges a controversy in that the Kweis contend "that SJWC's actions were inconsistent with the [e]asements and the Agreement, and that SJWC should be solely responsible for the repairs of the driveway because damages were caused by its excessive use." No contrary contention on the part of SJWC is alleged. No breach of the Agreement is

27

alleged, nor a need to enforce or interpret it. And no facts are alleged as to how SJWC's actions were "inconsistent with" it. But it is the Kweis who by their causes of action and in their requests for relief understandably seek to deviate or distance themselves from applying the Agreement's respective payment obligations to their claims for SJWC's alleged misuse and overuse of the easements, the damages for which are *not* rooted in the Agreement.

Thus, it is true that some aspects of the Kweis' pleaded causes of action factually include claims of damage to and the need for repair of some portions of their driveway. But all the alleged conduct by SJWC causing damage to the Kweis and their property, including but also beyond the driveway—the present controversy—concerns SJWC's claimed misuse and overuse of the easements for ingress and egress during the specified period of the Project, and related negligence. (*Drell, supra*, 232 Cal.App.4th at pp. 29–30 [to identify the controversy, court examines the specific acts of alleged wrongdoing and not just the form of the claim].) The nature of the dispute is thus unrelated to respective payment obligations for the routine repair and regular maintenance of specified portions of the driveway based on regular use—the subject of the Agreement. It is precisely because of the alleged misuse and overuse of the easements, including portions of the driveway that appear to be within their boundaries, that the Kweis do not seek enforcement of the Agreement or compensation or damages under it. The gravamen of all of their causes of action, mostly torts, arises from SJWC's conduct or actions having roots in the easements, and their adjudication will flow from determinations about the proper and intended use and scope of the easements, and the respective rights and obligations arising therefrom, unaffected by the Agreement.

Turning to the Agreement and whether its arbitration provision covers the present controversy as we have identified it from the Kweis' complaint, we

again observe that the Agreement's subject matter concerns the respective payment obligations of the parties for "routine maintenance of the [driveway] road surface" and for "completing all repairs reasonably required to be made on the First Portion of the Driveway Property in order to have it remain serviceable and safe," along with the requirement to "coordinate efforts to maintain the road surface of [the] First Portion [of the driveway] in a safe and serviceable condition." We, like the trial court, find the Agreement facially unambiguous in its meaning and scope, both of which concern payment obligations for routine repairs and regular maintenance of portions of the driveway—ordinary wear and tear occasioned by regular and proper use by the parties and by SJWC within the scope of the easements.[6] And the only evidence in the record of the circumstances surrounding the execution of the Agreement is that Long Kwei had been "negotiating with SJWC [him]self for the maintenance and repair of the driveway for about 12 years before" the parties entered into the Agreement, which was drafted by SJWC, in 2015. This evidence adds nothing, contextual or otherwise, to the plain text of the Agreement and is neither consistent nor inconsistent with its terms.

As for the arbitration provision, the Kweis are correct that it is considered a "broad" one as it covers "any dispute arising out of or *in any way relating* to this Agreement." (Italics added, capitalization & boldface omitted.) (See, e.g., *Rice, supra*, 248 Cal.App.4th at p. 286; *Ahern, supra*, 74 Cal.App.5th at p. 689.) Thus, the provision would include claims, torts for example, that do not

---

[6] The Kweis argue on appeal for the existence of "latent ambiguities" in the Agreement and faulted the trial court for not considering these in its interpretation of it. But the Kweis offered no extrinsic or parol evidence to support the existence of a latent ambiguity occasioned by the Agreement's omission of reference to the easements or any meaning in the Agreement to be derived as a result.

necessarily arise from the contract itself and it would not be limited to only claims concerning the interpretation and enforcement of the Agreement. (*Vaughn, supra*, 87 Cal.App.5th at p. 221 [narrow clauses generally interpreted to apply only to disputes about the interpretation and performance of the agreement].) The Kweis appear to contend that our analysis would stop here at the determination that they showed the existence of an agreement between the parties that contains a broad arbitration clause. But, as we have determined, their burden of proof did not end there. It extended to a showing that the clause covers the controversy at issue. And here is where they stopped short.

As we've outlined, a broad arbitration provision using the phrase " 'arising from or related to' " "acquires meaning [only] by considering what two things are being related to each other." (*Vaughn, supra*, 87 Cal.App.5th at p. 220.) And when courts say that an arbitration agreement that includes the phrase " 'relating to' " is broad, it is because that wording "expands the reach of the agreement to encompass claims *rooted in* the contractual relationship, even if the claims do not arise from the . . . contract itself." (*Ibid*., italics added) Such a broadly worded clause " ' "may extend to tort claims that arise under or from the contractual relationship," ' " as there is " ' " 'no requirement that the cause of action arising out of a contractual dispute must itself be contractual. At most, the requirement is that the *dispute* must arise out of the contract.' " ' " (*Id*. at pp. 220–221, citing *Rice, supra*, 248 Cal.App.4th at p. 186.) The phrase " 'relating to' " "normally encompasses extracontractual claims only 'so long as they have their *roots in* the relationship between the parties which was created by the contract.' [Citations.]" (*Id*. at p. 221, italics added; accord, *Ahern, supra*, 74 Cal.App.5th at p. 692 [extracontractual claims must have their roots in the relationship between the parties created by the contract before they can be deemed to fall within broad arbitration clause].)

30

As we examine the nature of the Agreement and the Kweis' claims and their relationship to one another, it is apparent that the present controversy is *not* rooted in the contract containing the ADR clause, broad as it may be. The dispute is instead rooted in and arises out of the easements burdening the Kweis' property and benefitting that of SJWC, the rights and obligations flowing therefrom, and from SJWC's alleged misuse and overuse of the servitude, causing the Kweis' claimed damages. Even the repair costs for claimed damage to the driveway—while factually overlapping the Agreement in that they both concern the general topic of repair to this location of the Kweis' property—are not in any sense "rooted in" the Agreement, which addresses only payment obligations for routine repair and regular maintenance of specified portions of the driveway, based on the parties' ordinary use. (*Vaughn, supra*, 87 Cal.App.5th at p. 222 [factual commonalities between arbitration agreement and claims at issue insufficient to bring claims within agreement absent any indication the parties understood the agreement to apply in that manner].) These claimed costs and damages cannot by the pleaded facts be characterized as "routine" or as part of regular maintenance to preserve the road's safety and integrity—the entire scope and bounds of the Agreement. They are instead the sole result of SJWC's alleged misuse and overuse—during the Project's construction in 2019 and 2020—of the easements for ingress and egress, which predate the Agreement by decades and subject to which the Kweis acquired their property in 1994.

Perhaps recognizing this, the Kweis have pleaded, in conclusory fashion, that because the Agreement was recorded and purports to run with the land, it constitutes an " 'addendum' " to the recorded easements.[7] But this thin reed

---

[7] We are not here determining, for purposes of the law of the case, the substantive rights and obligations of either the easements or the Agreement.

31

does not supply the roots to sufficiently relate the pleaded claims to the Agreement and its arbitration clause. The Kweis do not explain just how the fact that the Agreement was recorded and purports to run with the land makes it an "addendum" to the easements, or causes any resulting legal effect, even if the subject matter of both have factual overlap or commonality in the limited topic of repairs to the driveway. And even if the Agreement itself was "predicated" on the easements, as the Kwies urge, this would not root their causes of action in it, as it is the easements, not the Agreement, at the foundational root of their claims.

In sum, and on the record before us containing no extrinsic evidence going either way on the point, we see nothing about the unambiguous Agreement or its scope to evince that the parties intended or agreed that its arbitration clause would extend to the present controversy embodied in the pleaded facts and claims. We conclude that notwithstanding the broad arbitration clause contained in the Agreement that encompasses claims arising from it or in any way related to it, the clause does not encompass the present dispute or controversy because the dispute is not rooted in the Agreement or in the contractual relationship created by it. The relevant relationship is that created by virtue of the recorded easements and the dominant and servient aspects attached to the lands of the respective parties as a result.

IV.    *The Trial Court's Implied Finding on a Disputed Fact Relating to Estoppel is Supported by Substantial Evidence*

Invoking Evidence Code section 623,[8] the Kweis raised below and argue on appeal the alternative theory that SJWC should be estopped from denying

---

[8] Evidence Code section 623 provides that "[w]henever a party has, by his own statement or conduct, intentionally led another to believe a particular

32

that the dispute is arbitrable because it "agreed to mediation pursuant to the Agreement."[9] The claim is premised on the Kweis' counsel having corresponded with SJWC's counsel several times before the mediation took place, "invok[ing] the mediation and arbitration process" provided in the Agreement, and SJWC having later agreed to and having participated in the unsuccessful mediation— a prerequisite to arbitration under the Agreement—thereby "essentially consent[ing] to the ADR stipulated in the Agreement." According to the Kweis' counsel, SJWC never disputed the arbitrability issue until after they later demanded arbitration and the Kweis therefore "expended significant time energy, and attorney's fees and costs on the mediation. Had SJWC raised the issue before the mediation, [the Kweis] could have sought a motion to compel arbitration almost a year" earlier.

SJWC responded to this theory in its opposition below, and its counsel factually disputed that SJWC had waited until after the mediation to convey its position that the dispute was not covered by the ADR provision in the Agreement, declaring that SJWC never agreed to arbitration and that "throughout [the parties'] settlement discussions, [she] noted that it was questionable whether the arbitration provision even applied to the dispute."[10] Thus, the record reflects a disputed issue of fact before the trial court on this

_____

thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."

[9] On appeal, SJWC contends that this issue is forfeited, not having been raised in the trial court. But, as the record shows, it clearly was.

[10] We understand "noted" in this context to mean, viewed in the light most favorable to the order on appeal, that SJWC's question or reservation about the arbitrability of the dispute under the Agreement was conveyed to the Kweis or their counsel in the course of the settlement discussions.

question relating to the element of justifiable reliance to support the doctrine of estoppel.

"The doctrine of equitable estoppel is founded on ' " '[t]he vital principle . . . that [a person] who by [their] language or conduct leads another to do what [they] would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which [they] acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both.' " [Citation.]' [Citation.] 'The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) [they] must intend that [their] conduct shall be acted upon; (3) the other party must be ignorant of the true state of facts; and (4) [they] must rely upon the conduct to [their] injury. [Citation.]' [Citation.]" (*Blaser v. State Teachers' Retirement System* (2023) 86 Cal.App.5th 507, 528.) Thus, reliance is an element of estoppel and if counsel for SJWC in fact questioned whether the arbitration provision covered the dispute "throughout [the parties'] settlement discussions," which appear from the record to have occurred both before and during the mediation, that fact would defeat the Kweis' stated reliance.

As noted, the Kweis submitted a request for statement of decision to the trial court with their motion to compel arbitration, citing sections 632 and 1291 and rule 3.1590 of the California Rules of Court, but the request did not seek any findings or raise any factual issue about their alternative estoppel theory. The trial court did not formally issue a statement of decision or follow the process set out in rule 3.1590 of the California Rules of Court. Nor did it address this theory in its denial order. The Kweis did not contest the tentative ruling in this regard (or any other) or object in any way to the trial court not having decided this disputed factual question as a principal controverted issue or otherwise bring this omission to the court's attention. This means that the

34

doctrine of implied findings applies on appeal, and our review of the implied factual finding of the Kweis' lack of reliance is limited to ascertaining whether it is supported by substantial evidence. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792–793; § 634; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267 (*Shaw*).)

As noted, section 1291 requires the court to issue a statement of decision when denying a motion to compel arbitration if one is properly requested. (*Metis, supra*, 200 Cal.App.4th at p. 687; accord, *Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970 (*Acquire*).) But no statement of decision is required if the parties fail to properly make a request. (*Acquire*, at p. 970.) "A party's failure to request a statement of decision when one is available has two consequences. First, the party waives objection to the trial court's failure to make all findings necessary to support its decision. Second, the appellate court applies the doctrine of implied findings and presumes all necessary findings supported by substantial evidence. [Citations.] This doctrine 'is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmative proving error.' [Citation.]" (*Ibid.*) The doctrine of implied findings likewise applies by a party's failure to specify in a request for statement of decision the controverted issue as to which they seek an explanation of the factual or legal basis of the court's decision or the failure to bring an alleged deficiency or defect in a requested statement of decision to the trial court's attention. (*Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1137 [mere request for statement of decision does not meet burden of notification]; § 634; *Marriage of Furie* (2017) 16 Cal.App.5th 816, 827; *Shaw, supra*, 170 Cal.App.4th at p. 267)

On this record, the Kweis did not include any factual or legal issues about their alternative estoppel theory in their request for statement of decision. And they did not bring to the trial court's attention that neither its tentative ruling nor final order, though not labeled as a statement of decision, made a ruling or findings on this issue. Under these circumstances, we will apply the doctrine of implied findings here, and conclude that the denial of the Kweis' motion to compel arbitration on the estoppel theory is supported by substantial evidence in the record. Specifically, the record contains substantial evidence that the Kweis did not pursue or engage in mediation in reliance on SJWC's having consented or submitted to arbitrability under the Agreement by its own participation in mediation, as its counsel had questioned whether the arbitration provision covered the dispute "throughout [the parties'] settlement discussions," which occurred both in the months before and then during the mediation. This evidence—in conflict with the Kweis' counsel's declaration— defeats any asserted and justifiable reliance on their part.

Because the record contains conflicting evidence on the Kweis' reliance going to their estoppel theory, and because a statement of decision on this point was available but was not pursued and the trial court made no findings on the issue, which omission was not brought to its attention, we will apply the doctrine of implied findings, concluding that the court's denial order in this respect is supported by substantial evidence.

## DISPOSITION

The order denying the Kweis' motion to compel arbitration is affirmed. Respondent SJWC is entitled to its costs on appeal.

36

_____
WILLIAMS, J.*

WE CONCUR:


_____
BAMATTRE-MANOUKIAN, ACTING P.J.



_____
LIE, J.



*Long Kwei, Individually and as Trustee, etc., et al. v. San Jose Water Company*
H050233

---

\* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.