Filed 6/28/24  Kaufman v. Adani CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEVEN J. KAUFMAN, et al., <br><br> Plaintiffs and Respondents, <br> v. <br> ALON ADANI, et al., <br><br> Defendants and Appellants. | A169221 <br><br> (Marin County Super. Ct. <br>  No. CV0000222) |

The parties' pending dispute arises from a twenty-year business partnership between plaintiff Steven Kaufman and defendant Alon Adani, which involved the creation of over twenty LLC entities, numerous real estate holdings, and tens of millions of dollars in assets.  Kaufman and plaintiff Cornerstone Communities QOF II, LLC[1] filed suit against defendants Adani, Nicalo, LLC, Cornerstone Communities QOF I, LLC, Cornerstone Communities I, LLC, 556 Ross St. Downtown LLC, Downtown Station RRSQ LLC, Cornerstone Communities II, LLC, and Mendocino Downtown LLC (jointly, defendants), alleging eighteen causes of action for various wrongs.

---

[1] Although plaintiffs also name Cornerstone Communities QOF II, LLC as a defendant in their complaint, that entity only appeared as a plaintiff in connection with the motion to compel, and we thus excluded it from the list of defendants for purposes of this appeal.

1

On appeal, defendants challenge the trial court's partial denial of their motion to compel arbitration. They assert the trial court erred in refusing to compel arbitration of various claims related to a promissory note executed by defendant Nicalo and the creation and funding of defendants Cornerstone Communities QOF I, LLC, Cornerstone Communities I, LLC, 556 Ross St. Downtown LLC, Downtown Station RRSQ LLC, Cornerstone Communities II, LLC, and Mendocino Downtown LLC. We conclude the claims related to the promissory note are subject to arbitration, but otherwise affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

*Fact Background*

### A. Cornerstone SA

Kaufman has been a long-time commercial real estate investor. Based on Kaufman and Adani's close friendship, they entered into a joint business venture operated via an entity called SA Structure, LLC (SA Structure). Kaufman and Adani were the sole members and managers of the company. They executed an operating agreement for SA Structure, which contained an arbitration provision. SA Structure was renamed Cornerstone Properties SA, LLC (Cornerstone SA) in 2010.

In 2009 and 2011, Kaufman acquired two commercial real estate properties valued at $12.4 million and placed them within Cornerstone SA. Adani did not contribute capital towards the purchase of these properties.

In July 2018, Adani informed Cornerstone SA's accountants that he had obtained a loan from Kaufman to " 'purchase[ ] 50% of [Kaufman's] capital interest' " in Cornerstone SA. The following month, Adani executed a promissory note on behalf of Nicalo, LLC (Nicalo) reflecting a loan of $4,249.337.72 (Nicalo note). Adani is the sole member of Nicalo. Kaufman did not sign the note.

2

Based on the Nicalo note and Adani's representations, the accountants provided Adani with a 50% capital interest in Cornerstone SA's assets and transferred the approximate $4.25 million from Kaufman's capital account to Adani's capital account.  In 2021, a few years after execution of the promissory note, the properties were valued in excess of $32 million.

*B. The Other Cornerstone Entities*

Kaufman held the majority of his real estate assets in Cornerstone Properties II S, LLC (Cornerstone II S).  Kaufman was the sole member of this entity and the owner of the assets.

Around 2014, Kaufman formally appointed Adani as the manager of Cornerstone II S.  While Kaufman remained a manager, he relied on Adani to primarily operate the business.  In exchange, Kaufman and Adani agreed Adani would receive fifty percent of the net profits of the properties he was managing, and fifty percent of the profits of the sale of any such property after Kaufman was reimbursed for his invested capital in the property.  The operating agreement for Cornerstone II S did not contain an arbitration provision, and instead provided that "[t]he parties each submit to the exclusive jurisdiction of the courts in Santa Clara County, California."

In 2015, Cornerstone II S moved most of its properties into separate LLCs, each named for the property location[2] (the CPSA entities), " 'to limit [the] full exposure of one large entity.' "  The CPSA entities each had separate operating agreements, each designating Adani as the manager.

---

[2] These entities are: CPSA – Airport Industrial Park, LLC; CPSA – Neotomas and Corporate Center, LLC; CPSA – Corporate Center, LLC; CPSA – Neotomas, LLC; CPSA – Mendocino, LLC; CPSA – Old Redwood Highway, LLC; CPSA – River and Fulton, LLC; CPSA – Santa Rosa, LLC; CPSA – Todd Road, LLC; and CPSA – Westwind and Laughlin, LLC.

Some of these agreements contained arbitration provisions. Others did not, and instead stated disputes must be resolved in court.

Kaufman and Adani subsequently executed amended operating agreements for all the CPSA entities.[3] These amended operating agreements uniformly contained arbitration provisions, which required that "any controversy or dispute arising out of or related to this Agreement . . . shall be resolved by binding arbitration . . . ."

In 2019, Kaufman and Adani created Cornerstone Properties Management SA LLC (Cornerstone Management) for "any lawful business . . . including but not limited to the management of real properties." Around the same time, they formed Cornerstone coLAB, LLC (Cornerstone coLAB). Adani served as manager of both entities. The current operating agreements for Cornerstone Management and Cornerstone coLAB also contain arbitration provisions, which mirror the arbitration provision of the CPSA entities.

At some point prior to 2020, Kaufman began suffering from dementia. These symptoms included intense pain, brain fog, and memory issues that have made it "very difficult" to focus on and understand complex financial and business documents and transactions. Kaufman alleges that, after he began suffering from the effects of dementia, Adani took advantage of his condition. He contends Adani presented numerous documents to Kaufman as ordinary and routine business documents requiring immediate signature. However, Kaufman now asserts these documents materially altered the terms of Adani's compensation and the parties' rights and ownership interests to Kaufman's detriment.

---

[3] Kaufman asserts this happened in 2020. The agreements, however, are dated in 2016, 2017, or 2019.

4

### C. Potrero Partners and the QOZ Entities

In 2011, Cornerstone II S formed Potrero Partners LLP (Potrero Partners) with a different investor, Josh Smith. Kaufman and Smith signed an amendment to Potrero Partners' operating agreement to provide Adani with a ten percent interest in the company's profits to compensate Adani for identifying properties for investment.

In 2019, Potrero Partners sold a set of properties, the sale of which generated approximately $42 million for Kaufman and $7.8 million for Adani. At the time, certain areas in the country had been designated Qualified Opportunity Zones (QOZs), investments which Adani claimed could provide deferred capital gains taxes. Kaufman asserts Adani convinced him to pursue the QOZ tax-saving strategy, but he did not understand the details of the investment or Adani's intent for those projects. Accordingly, Kaufman and Adani formed Cornerstone Communities QOF I, LLC (QOF I) and Cornerstone Communities QOF II (QOF II), which would hold Adani's and Kaufman's proceeds respectively. They also formed two QOZ business entities—Cornerstone Communities I, LLC (Cornerstone Communities I) and Cornerstone Communities II, LLC—and three QOZ property-holding, lessee entities—556 Ross St Downtown, LLC, Mendocino Downtown, LLC, and Downtown Station RRSQ, LLC (jointly, the QOZ entities).

Kaufman was designated the manager of QOF II, while Adani was the manager for QOF I and the remaining QOZ entities. The operating agreements for QOF I, QOF II and the QOZ entities did not contain arbitration provisions.

As part of these QOZ transactions, two QOZ entities entered into ground leases with CPSA-Mendocino, LLC to develop certain properties

already owned by CPSA-Mendocino, LLC. Adani and employees of Cornerstone Management supervised and managed these projects.

After the funds from Potrero Partners had transferred to QOF I and QOF II, Adani began transferring money from Kaufman's account in QOF II to Cornerstone Communities I, including a lump sum of $32 million. Kaufman asserts he did not consent to the transfers and, because Adani is the sole manager of Cornerstone Communities I, he has lost control of the transferred funds. He further contends Adani has claimed a 50% ownership interest in Cornerstone Communities I even though Kaufman's QOF II assets form the majority of funds in Cornerstone Communities I.

*Procedural Background*

In June 2023, plaintiffs Kaufman, individually and as trustee under Declaration of Trust dated October 30, 1998, and QOF II (jointly, plaintiffs) filed a complaint for monetary damages against Adani, Nicalo, QOF I, QOF II, and the QOZ entities. The complaint alleged eighteen causes of action: (1) breach of contract (all plaintiffs against Adani); (2) breach of the duty of loyalty (all plaintiffs against Adani); (3) civil theft (all plaintiffs against all defendants); (4) fraud in the inducement (all plaintiffs against Adani); (5) intentional misrepresentation (all plaintiffs against Adani); (6) concealment (all plaintiffs against Adani); (7) constructive fraud (all plaintiffs against Adani); (8) negligent misrepresentation (all plaintiffs against Adani); (9) negligence (all plaintiffs against Adani); (10) conversion (all plaintiffs against all defendants); (11) unjust enrichment (all plaintiffs against all defendants); (12) financial abuse of a dependent adult (Kaufman against all defendants); (13) rescission (all plaintiffs against all defendants); (14) judicial dissolution (all plaintiffs against the QOZ entities); (15) accounting (all plaintiffs against Adani); (16) aiding and abetting (all

6

plaintiffs against Nicalo and the QOZ entities); (17) breach of contract (Kaufman against Nicalo); and (18) declaratory judgment (Kaufman against Adani).

Kaufman asserted Adani utilized his position of trust with Kaufman to transfer money and property interests from Kaufman to himself. These acts of alleged malfeasance included (1) utilizing misrepresentations and omissions to incorporate a perpetual "profits interest" provision into a 2014 management agreement for Cornerstone II S, (2) failing to remove certain properties out of Cornerstone II S that were not subject to the management agreement, (3) failing to track his capital investments in the CPSA properties, (4) utilizing the Cornerstone Management and Cornerstone coLAB operating agreements to create a 50/50 ownership structure rather than a 50/50 profit structure, (5) altering the compensation structure for the CPSA entities by changing the benchmark calculation from Kaufman's invested capital to the fair market value of the property minus existing debt on the property, as well as artificially setting reduced valuations for the CPSA-held properties, (6) reducing the benchmark calculations further via grant agreements in connection with the CPSA-held properties, (7) improperly causing various Cornerstone entities to take at least eight loans, totaling over $40 million, on different Cornerstone properties to maximize "profit draws" to himself, rather than reducing debt as required by the operating agreements, (8) fraudulently asserting a 50% capital interest in Cornerstone SA based on an alleged promissory note between Nicalo and Kaufman, (9) using his position of trust "to induce [Kaufman] to alter his closing instructions [for the sale of Potrero Partner assets] and direct that his funds be transferred to a qualified opportunity zone entity at closing", (10) abusing his position of trust by creating unfavorable operating

7

agreements for Cornerstone Communities I, QOF I, and QOF II, which provided Adani with complete control over the entities and assets, and (11) improperly transferring money from QOF II to Cornerstone Communities I and misrepresenting his ownership rights in Cornerstone Communities I.

Adani filed a motion to compel arbitration. He alleged the operating agreements of Cornerstone SA, Cornerstone Management, and Cornerstone coLAB, along with the amended operating agreements for the CPSA entities, all contained binding arbitration provisions that encompassed the complaint allegations. Nicalo, QOF I, and the QOZ entities joined the motion to compel.

Plaintiffs opposed the motion to compel. They asserted no arbitration provision existed between themselves, Nicalo, and the QOZ entities, and many of the claims did not relate to the CPSA entities' operating agreements or any other agreement with an arbitration provision.

The trial court granted in part and denied in part Adani's motion to compel arbitration. Specifically, and as relevant to this appeal, the court denied the motion as to plaintiffs' claims relating to the Nicalo note and the QOZ entities in the first through fifteenth, and eighteenth causes of action. The court also denied the motion as to the fourteenth, sixteenth, and seventeenth causes of action in full.

Specifically, the court first concluded the 2003 operating agreement for SA Structure—later Cornerstone SA—did not encompass all the claims in the complaint because at the time of contracting, the operating agreement was for the limited purpose of rehabilitating and selling a single home in Tiburon. The court also found the provision unenforceable because it failed to identify the arbitration provider or any applicable rules or procedures.

8

Next, the court rejected Adani's argument that the Cornerstone Management operating agreement, the Cornerstone coLAB operating agreement, and the various CPSA entities' operating agreements required arbitration of all claims. The court reasoned that because the QOZ entities' operating agreements did not contain an arbitration provision but instead contained integration clauses, and those entities received their funds from Potrero Partners—a company separate from the Cornerstone business— Adani had failed to show that the QOZ agreements were part of an ongoing series of transactions that should subject them to a Cornerstone entity's arbitration provision. The court also found the venue provision in the Nicalo note, which applied to any proceeding "related to" the note, superseded any applicable earlier arbitration provision.

Defendants timely appealed.

## DISCUSSION

On appeal, defendants assert the trial court erred by failing to compel all claims to arbitration. They contend they have standing to invoke the relevant arbitration provisions, and the claims at issue fall within the scope of those provisions.

" 'In general, "[t]here is no uniform standard of review for evaluating an order denying a motion to compel arbitration. [Citation.] If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed." ' [Citation.] In the absence of conflicting extrinsic evidence, ' "[w]hether and to what extent [nonsignatories] can also enforce the arbitration clause is a question of law, which we review de novo." ' " (*Jensen v. U-Haul Co. of Cal.* (2017) 18 Cal.App.5th 295, 300.)

9

## I. Legal Principles

" 'California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration.' " (*Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890 (*Aanderud*).) As the language of Code of Civil Procedure section 1281.2 "makes plain, the threshold questions presented by every motion or petition to compel arbitration are whether an agreement to arbitrate exists [citations] and, if so, whether the parties' dispute falls within the scope of that agreement." (*Ahern v. Asset Mgmt. Consultants, Inc.* (2022) 74 Cal.App.5th 675, 686–687.) The party seeking arbitration bears the preliminary burden of proving the existence of an applicable agreement to arbitrate. (*San Francisco Police Officers' Assn. v. San Francisco Police Com.* (2018) 27 Cal.App.5th 676, 683.) Once an agreement to arbitrate is established, the party opposing arbitration has the burden to show the arbitration provision does not encompass the claims in the complaint. (*Aanderud*, at p. 890.) Absent an agreement to arbitrate, a dispute may not be ordered to arbitration. (*Ahern v. Asset Mgmt. Consultants, Inc.*, *supra*, 74 Cal.App.5th at pp. 687–688 [" ' "[T]he terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested." ' "]; accord Civ. Code, § 1648 ["[h]owever broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract"].)

" ' "[T]he decision as to whether a contractual arbitration clause covers a particular dispute rests substantially on whether the clause in question is 'broad' or 'narrow.' " [Citation.] "A 'broad' clause includes those using language such as '*any claim* arising from or *related to* this agreement[ ]' " [citation] or " 'arising in connection with' the agreement" [citation]. ". . .

10

'There is no requirement that the cause of action arising out of a contractual dispute must be itself contractual. At most, the requirement is that *the dispute* must arise out of [the] contract.' " ' [Citations.] Broad arbitration clauses are interpreted to apply to extracontractual disputes between the contracting parties, ' "so long as they have their roots in the relationship between the parties which was created by the contract." ' [Citations.] In deciding whether a dispute has its roots in the relationship created by the contract, we 'examine[ ] the nature of the agreement and of the claims and their relationship to one another . . . .' " (*Howard v. Goldbloom* (2018) 30 Cal.App.5th 659, 663–664.)

## II. The Arbitration Provisions

Defendants assert the claims before this court must be compelled to arbitration based on: (1) a 2003 operating agreement for SA Structure, later renamed Cornerstone SA; (2) a 2019 operating agreement for Cornerstone Management; and (3) various operating agreements, dated between 2016 to 2019, for the CPSA entities. We examine the terms of these agreements and consider whether they apply to the pending dispute.

### A. The Cornerstone SA Operating Agreement

In 2003, Kaufman and Adani created SA Structure for operating a joint business venture. In its "Part Seven Miscellaneous" section, paragraph five, the operating agreement stated the "[c]haracter of [the] [b]usiness" was "the transaction of any and all lawful business under the laws of the State of California," but both Kaufman and Adani acknowledge it was created for the purpose of rehabilitating a single residential property. The operating agreement included the following dispute resolution provision: "Any dispute or discomfort arising out of or in connection with this agreement, including

11

disputes between or among the members, shall be settled by the [sic] negotiation, mediation and arbitration."

In the same section, paragraph 10, it provides that the parties "intend a fair, balanced, and 'win-win' arrangement between and among themselves. If this intent is hereafter frustrated by unusual change in circumstances which occurred outside the control of the parties or from circumstances none of the parties reckoned with at the time of entering into this contract, and which create an undue and unreasonable hardship on any of the parties or gross inequities between the parties, then the parties desire, through fair and reasonable modifications, a rebalancing of the relationship through arbitration."

In "Part Three Profits and Losses," the agreement provides salary will be paid for services performed in winding up the affairs of the LLC, "under any applicable provisions of the California Limited Liability Company Act, in a reasonable amount as agreed between the parties having an interest in the LLC or by arbitration."

In the Miscellaneous section, the operating agreement further states, in the event of any uncertainty in interpretating the agreement, that the parties would be bound by either (1) "an interpretation given in writing by the attorney who drew this agreement," or if no longer practicing, (2) "a written interpretation by a senior member of the last law firm with which the named attorney practiced."  The provision then provides, "If that law firm has ceased to be in existence at the time of such interpretation, then written interpretation shall be obtained by arbitration."  The "General Information" section left blank the subsection titled, "Attorney Who Drafted This Agreement."

In 2010, the operating agreement was amended to rename the entity Cornerstone SA. No other amendments were made to the operating agreement. It is undisputed that two additional properties were added by Kaufman to Cornerstone SA's portfolio in 2009 and 2011.

## B. The CPSA Entities' Operating Agreements

In 2015, Kaufman moved the majority of his real property holdings from Cornerstone II S into ten different LLCs, referred to as the CPSA entities. Initially, the operating agreements for the CPSA entities were not uniform, with some containing arbitration provisions and some without. Kaufman and Adani subsequently executed amended operating agreements, which uniformly contained arbitration provisions.[4] Those provisions stated in relevant part: "In the event that any controversy or dispute arising out of or related to this Agreement . . . has not been resolved by mediation . . . such Dispute shall be resolved by binding arbitration at San Francisco, California, by and under the rules of JAMS/Endispute . . . ."

## C. The Cornerstone Management Operating Agreement

In 2019, Kaufman and Adani formed Cornerstone Management for "any lawful business . . . including but not limited to the management of real properties." The parties dispute whether Cornerstone Management's purpose was solely property management of the real property assets held by the CPSA entities, or broader management of the various Cornerstone entities. The complaint states Cornerstone Management's operating agreement "purports to create an entity through which the other Cornerstone *entities* were to be managed." (Italics added.) Conversely, Adani's declaration states

---

[4] The amended agreements are dated between 2016 and 2019, but Kaufman asserts he did not sign these amended operating agreements until 2020.

13

"Cornerstone *holdings* are managed through [Cornerstone Management]," (italics added), and Cornerstone Management's employees consist of property and business managers and maintenance technicians. We further note Cornerstone Management is not identified as a manager in the operating agreements of any other Cornerstone entities.

The Cornerstone Management operating agreement also contains an arbitration provision that mirrors the provision in the CPSA entities' operating agreements.

## III. Whether the Dispute Falls Within the Scope of the Arbitration Provisions

### A. Claims Against Adani Generally

On appeal, Adani asserts the entirety of the complaint arises out of his role as a fiduciary for Kaufman, which is inherently tied to his role as manager of the various Cornerstone entities. Because Cornerstone SA's and Cornerstone Management's operating agreements, among others, contain arbitration provisions, he asserts those provisions should encompass any claim against him related to the Cornerstone business generally.

Undoubtedly, the arbitration provisions at issue are all broad, requiring arbitration of disputes arising out of or related to/in connection with the agreements. However, the scopes of the provisions are explicitly limited to the agreements at issue. "Where, as here, the parties have separate contractual relationships, which involve separate enterprises and most importantly separate commercial risks, an arbitration clause which governs one contractual relationship cannot be imposed in the other relationship without undermining the parties' reasonable expectations." (*Marsch v. Williams* (1994) 23 Cal.App.4th 250, 256.) That the parties entered into separate agreements—on different dates—to establish different

14

corporate entities—holding different real estate assets—indicates they did not expect to establish a general transactional relationship governed by the arbitration clause of any one particular agreement.[5]

Adani offers no evidence to the contrary. He has failed to identify any arbitration provision that applies to all Cornerstone entities and operations. And Adani, as the party seeking to compel arbitration, has the burden of proving the existence of an applicable arbitration agreement between the parties. (*San Francisco Police Officers' Assn. v. San Francisco Police Com.*, *supra*, 27 Ca.App.5th at p. 683.) We thus assess each of plaintiffs' claims separately to determine whether they fall within the scope of the arbitration provisions contained in the Cornerstone SA, the Cornerstone Management, or the CPSA operating agreements.

## B. Claims Related to the Nicalo Note

The first group of claims the court declined to compel to arbitration were those related to the Nicalo note. The court concluded the operating agreement for Cornerstone SA did not encompass the claims related to the Nicalo note, and the Nicalo note itself did not contain an arbitration provision.

On appeal, Adani asserts these claims arise out of his role as manager of Cornerstone SA and are subject to the arbitration provision therein. He further contends Cornerstone SA's arbitration provision is not fatally uncertain. We agree.

---

[5] Adani acknowledges in his brief that the arbitration provisions constitute "agreement[s] to arbitrate disputes arising out of or relating *to the entities governed by those agreements*." (Italics added.)

15

## 1. The Cornerstone SA Operating Agreement Applies

The applicable operating agreement for Cornerstone SA encompasses any dispute "arising out of or in connection with" the agreement. And the parties do not dispute that Cornerstone SA's original purpose—renovating a single home—was expanded when Kaufman transferred two additional properties into its holdings. Because the parties did not alter any terms of Cornerstone SA's operating agreement despite changing its name and expanding its purpose, it is reasonable to presume the parties intended the operating agreement, including the arbitration provision, to continue to apply to the expanded business. Kaufman has not offered any evidence to the contrary. (See *Aanderud*, *supra*, 13 Cal.App.5th at p. 890.)

"The operative question is whether [the plaintiff's] claims ' "have their roots in the relationship between the parties which was created by the contract." ' " (*Howard v. Goldbloom*, *supra*, 30 Cal.App.5th at p. 667.) Here, the claims related to the Nicalo note involve two properties held by Cornerstone SA. Kaufman's allegations against Adani related to *both* his creation of an allegedly fraudulent loan document *and* his alleged abuse of his role as manager of Cornerstone SA. Specifically, the complaint—in discussing Adani's creation of the promissory note—states:

- "Adani used his authority as Manager to once again obtain significant rights in [Cornerstone SA] for his own benefit."
- "Adani caused Cornerstone's accountants to shift more than $4 million in property rights from [Kaufman] to himself";
- These discussion between Adani and Cornerstone's accountants occurred during business meetings and/or in connection with the preparation of Cornerstone SA's tax returns; and

- Adani "fabricated the explanation and Nicalo Note he provided to [Cornerstone SA's accountants] in order to justify a 50% capital interest in Cornerstone SA."

These allegations are certainly rooted in the Cornerstone SA operating agreement because they allege mismanagement by Adani in his role as manager of Cornerstone SA. Adani would have no ability to impact the ownership and capital accounts of Cornerstone SA if he were not managing Cornerstone SA. And Adani was appointed manager of Cornerstone SA via its operating agreement. Thus, the claims related to the Nicalo note are directly connected to the Cornerstone SA operating agreement and trigger application of the arbitration provision. (See *Buckhorn v. St. Jude Heritage Medical Group* (2004) 121 Cal.App.4th 1401, 1407.)

In response, plaintiffs contend the Nicalo note's forum selection clause supersedes the Cornerstone SA operating agreement's arbitration provision. That provision reads as follows: "[Nicalo] consents to the exclusive jurisdiction of California and further agrees that the venue for any action or proceeding relating to this Note shall be in Marin County, California." We disagree.

As an initial matter, we observe the Nicalo note is not a contract between the parties but rather a unilateral obligation by Nicalo/Adani and unsigned by Kaufman. As such, it cannot modify the arbitration provision in the Cornerstone SA operating agreement, which requires any modifications or alterations to be made by "written agreement or authorization of all the members."

Moreover, as explained in *Suski v. Coinbase, Inc.* (9th Cir. 2022) 55 F.4th 1227—a case on which plaintiffs rely—"[u]nder California law, ' "[t]he general rule is that when parties enter into a second contract dealing with

17

the same subject matter as their first contract without stating whether the second contract operates to discharge or substitute for the first contract, the two contracts must be interpreted together and the latter contract prevails to the extent they are inconsistent." ' " (*Id.* at p. 1230.) But here, the Nicalo note neither addresses the same subject matter nor conflicts with the operating agreement's arbitration provision.

Substantively, the Nicalo note does not address Adani's authority as manager of Cornerstone SA, management of Cornerstone SA assets, or his duties in interacting with Cornerstone SA's accountants. As to forum, the Nicalo note states, "the venue for *any action or proceeding* relating to this Note shall be in Marin County, California," and "the exclusive jurisdiction" is California. "[A]ny action or proceeding" does not preclude arbitration. In *Ramirez–Baker v. Beazer Homes, Inc.* (E.D. Cal. 2008) 636 F.Supp.2d 1008, an employer sought to arbitrate an employee dispute based on an applicant statement signed by the plaintiff when she was initially hired. (*Id.* at p. 1014.) The plaintiff had subsequently signed agreements containing integration clauses that made no reference to arbitration, and she claimed these subsequent agreements negated her original applicant statement's arbitration provision. (*Id.* at p. 1015.) The court rejected her argument and noted there was no showing the subsequent agreements were expressly or implicitly inconsistent with her arbitration obligation. Where one agreement identifies arbitration as the forum for resolving disputes, and a subsequent agreement omits any reference to such a forum, " 'any doubts must be resolved in favor of arbitration.' " (*Id.* at p. 1017.)

Because the Nicalo note does not specify a forum, it does not conflict with the arbitration provision in the operating agreement. (See *Alexander v. Superior Court* (2003) 114 Cal.App.4th 723, 726–727 ["Forum means '[a]

18

court or other judicial body. . . . Venue is '[t]he county or other territory' in which a case may be heard' "].) Accordingly, the claims related to the Nicalo note are subject to the arbitration provision in the Cornerstone SA operating agreement.

### 2. The Cornerstone SA Operating Agreement Is Not Fatally Uncertain

The trial court also concluded the arbitration provision was unenforceable because it was ambiguous and uncertain, and plaintiffs reassert this argument on appeal.

Both the Federal Arbitration Act and California law express a strong public policy in favor of arbitration. (See 9 U.S.C. §§ 1-16; Code Civ. Proc., § 1280 et seq.) "Consequently, courts will ' "indulge every intendment to give effect to such proceedings." ' " (*Adajar v. RWR Homes, Inc.* (2008) 160 Cal.App.4th 563, 568.) The policy favoring arbitration, however, does not apply unless it is determined that the parties agreed to arbitrate their disputes, which requires an analysis of the state law principles that govern the formation and interpretation of contracts. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 790.)

Plaintiffs assert the parties never had a meeting of the minds because the arbitration provision is ambiguous as to what disputes are subject to negotiation verses mediation verses arbitration.[6] However, "[i]t is not uncommon for an arbitration provision to require some initial negotiation or mediation step before leading into arbitration; and such step does not make

---

[6] Plaintiffs' claim that "other provisions [in the operating agreement] . . . suggest that disputes should be resolved in court" is poorly taken. Their sole reference is to an attorney's fee provision allocating costs, which is silent on issues of forum selection.

the arbitration provision less binding." (*Cheshire v. United States Olympic Comm.* (C.D.Cal. Jun. 3, 2019, No. CV 18-5763-GW(RAOX)) 2019 WL 12381183, at *6, fn. 7.)  While we recognize the provision does not expand on these steps, we decline to conclude the lack of detail renders the provision ambiguous.  Because the provision uses "and" rather than "or," all claims are subject to arbitration.  (Compare with *Covillo v. Specialty's Café* (N.D.Cal. Oct. 17, 2012, No. C 11-00594 DMR) 2012 WL 4953085, at *2 [arbitration agreement's reference to "either arbitration or mediation" suggested a nonbinding process].)

Next, plaintiffs contend the arbitration provision is fatally ambiguous because it fails to identify an arbitration provider or applicable rules or procedures.  On this point, *HM DG, Inc. v. Amini* (2013) 219 Cal.App.4th 1100 (*HM DG*) is instructive.  In that case, the parties' agreement contained an arbitration provision that gave the parties three choices on how to jointly select an arbitrator "in accordance with the applicable United States Arbitration and Mediation Rules of Arbitration."  (*Id.* at pp. 1104, 1107.)  The plaintiff argued the arbitration provision's failure to specify a specific arbitrator, the office that would administer the arbitration, the related arbitration rules, and the arbitration's location evidenced a lack of mutual consent.  (*Id.* at pp. 1107–1109.)  The court disagreed, concluding the agreement sufficiently evidenced a meeting of the minds.  (*Id.* at pp. 1108–1109.)  The court concluded the arbitration provision did not need to identify a single method for selecting an arbitrator to be valid.  (*Id.* at p. 1108.)  It explained Code of Civil Procedure section 1281.6 authorized courts to appoint an arbitrator "to ensure a party's contractual right to arbitrate is enforced." (*Id.* at p. 1108.)  The court further explained selection of arbitration rules and location are "part and parcel of the appointment of an arbitrator . . . . Thus,

20

under section 1281.6, the absence of a specified forum or set of rules in an arbitration clause does not invalidate the agreement to arbitrate." (*Id.* at p. 1110.) The court concluded the arbitration provision at issue "clearly evidence[d] the parties' intention to submit their dispute to arbitration" and was enforceable. (*Id.* at p. 1111.)

Likewise, the arbitration provision in the Cornerstone SA operating agreement is not unenforceable due to its failure to specify the manner in which the arbitration would proceed. In the event the parties were unable to agree on an arbitrator, the applicable rules, or location, then the court has authority to establish those details. (See, e.g., Code Civ. Proc., § 1281.6 ["In the absence of an agreed method [for appointing an arbitrator], . . . the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator."]; *id.*, § 1282 ["Unless the arbitration agreement otherwise provides . . . [t]he arbitration shall be by a single neutral arbitrator"]; *id.*, § 1282.2, subd. (a)(1) [neutral arbitrator will set the time and place of the arbitration]; *id.*, § 1284.2 ["Unless the arbitration agreement otherwise provides . . . each party to the arbitration shall pay his pro rata share of the expenses and fees of the neutral arbitrator"]; *HM DG*, *supra*, 219 Cal.App.4th at p. 1110 [appointment of arbitrator includes "the forum and rules that will govern the arbitration"].)

The cases on which plaintiffs rely are distinguishable. Those cases either (1) address unconscionability (see *Solo v. Am. Assn. of Univ. Women* (S.D. Cal. 2016) 187 F. Supp.3d 1151)—an issue not asserted by plaintiffs, likely because they cannot argue " 'the overall bargain was unreasonably one-sided' " (*id.* at p. 1158), or (2) involved uncertainty over whether the parties agreed to a certain arbitration provision (see *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 66 [defendant "failed to present

21

sufficient evidence establishing the specific Fair Treatment Process it presented to the trial court was the Fair Treatment Process to which Plaintiffs agreed"]; *Maganallez v. Hilltop Lending Corp.* (N.D. Cal. 2007) 505 F.Supp.2d 594, 602 ["the addendum does not evidence a meeting of the minds regarding which agreement is subject to arbitration"]; *Lindsay v. Lewandowski* (2006) 139 Cal.App.4th 1618, 1623 [contract uncertain as to what the parties intended by the phrase "binding mediation"].)  None of these issues are applicable here.

We likewise find plaintiffs' reliance on *Flores v. Nature's Best Distribution, LLC* (2016) 7 Cal.App.5th 1 unavailing.  In *Flores*, the court found the arbitration provision unenforceable because it failed to (1) "identify with which entity or entities plaintiff had agreed to" arbitrate, (2) specify which claim would be subject to arbitration verses the grievance procedure contained in the collective bargaining agreement, and (3) state which set of the American Arbitration Association (AAA) rules would apply.  (*Id.* at pp. 9–10.)  The first two bases are inapplicable to the current dispute.  The third basis identified in *Flores* is distinguishable because the defendant first sought to enforce AAA rules that became effective 12 years after the plaintiff signed the agreement, and then argued—without any supporting evidence—that an alternative set of rules had been in effect at the time.  (*Id.* at p. 10.)  The *Flores* court thus found the agreement at issue ambiguous because of the defendant's inability to identify the applicable rules at the time the plaintiff executed the agreement.  The *Flores* court did not reach any broader conclusions regarding how arbitration provisions must identify any rules or procedures.

22

### 3. Nicalo is Entitled to Enforce the Arbitration Provision

Nicalo asserts it is entitled to arbitrate the claims against it, despite being a nonsignatory to the arbitration agreement, under the doctrines of agency and equitable estoppel.

A party seeking to compel arbitration must generally establish that he or she was a party to an arbitration agreement. (*DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1352–1353 (*DMS Services*); *JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1236.) However, both California and federal courts have recognized certain exceptions which permit a nonsignatory to an agreement with an arbitration clause "to compel arbitration of, or be compelled to arbitrate, a dispute arising within the scope of that agreement." (*DMS Services*, at p. 1353; see also *Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1713–1714.) These exceptions include when a nonsignatory defendant is acting as an agent of a signatory to the arbitration agreement (*Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406, 418) and under the doctrine of equitable estoppel (*Jensen v. U-Haul Co. of California* (2017) 18 Cal.App.5th 295, 306 (*Jensen*)).

" ' "The significant test of an agency relationship is the principal's right to control the activities of the agent." ' " (*Violette v. Shoup* (1993) 16 Cal.App.4th 611, 620.) However, an agency relationship with a signatory, without more, is generally insufficient to allow a nonsignatory to enforce an agreement to arbitrate. (*Jensen*, *supra*, 18 Cal.App.5th at pp. 304–305.) A nonsignatory defendant may compel arbitration only "where there is a connection between the claims alleged against the nonsignatory and its agency relationship with the signatory." (*Cohen v. TNP 2008 Participating Notes Program, LLC* (2019) 31 Cal.App.5th 840, 863.)

Here, there is undoubtedly an agency relationship between Adani and Nicalo. Adani is the sole member and manager of Nicalo. The complaint alleges Nicalo "is a vehicle by which Adani has received money owed to him in his personal capacity and through which he contracted during the relevant times set forth in this Complaint." The complaint further asserts: (1) "Adani has control of and directed [Nicalo], and they acted, in part, through Adani's own conduct and representations . . .", and (2) "Adani created and signed a promissory note on behalf of his entity, Defendant Nicalo," which provided the basis for the ownership rights he claimed in the Cornerstone SA properties.

Moreover, the claims alleged against Nicalo are tied to its agency relationship with Adani. Nicalo acted as Adani's agent in creating the note and receiving the alleged interest in Cornerstone SA. As alleged in the complaint, Nicalo was "a vehicle by which Adani has received money owed to him in his personal capacity and through which he contracted during the relevant times set forth in this Complaint." Accordingly, plaintiffs' claims against Nicalo are directly connected to its agency relationship with Adani in participating in the Nicalo note.

In sum, plaintiffs' claims against Adani and Nicalo related to the Nicalo note should be compelled to arbitration. This includes (1) the first through thirteenth, fifteenth, and eighteenth causes of action as against Adani, to the extent those claims arise from the Nicalo note and related conduct, (2) the third, tenth through thirteenth, and sixteenth causes as against Nicalo, and (3) the seventeenth cause of action against Nicalo.[7]

---

[7] While we recognize the seventeenth cause of action—the breach of contract claim against Nicalo—solely addresses enforcement of the Nicalo note, its enforceability is contingent on a determination of whether Adani

24

## C. Claims Regarding the QOZ Entities

The second group of claims at issue relates to the transfer of funds from Potrero Partners to QOF I and QOF II, the subsequent structuring of QOF I, QOF II, and the QOZ entities via their respective operating agreements, the redistribution of funds between QOF I, QOF II, and the QOZ entities, and the designation of ownership interests in the QOZ entities.[8]

Defendants assert they do not seek to compel arbitration of these claims based on QOF I, QOF II, or the QOZ entities' operating agreements. Rather, they assert these claims must be compelled to arbitration pursuant to the arbitration provisions in Cornerstone Management's and the CPSA entities' operating agreements. Specifically, defendants assert the claims against them are subject to arbitration because the claims "center[ ] on the allegation that [Adani] caused [Kaufman] to invest in the QOZ Entities by exploiting [Adani's] role as Cornerstone['s] manager."

As explained in Part III.A., *ante*, each company functions pursuant to a separate operating agreement. Those operating agreements set forth the relevant company's ownership and management structure. Outside of these operating agreements, defendants have failed to identify any overarching

_____

fraudulently created the note. Accordingly, it is appropriate to include this claim in the matters subject to arbitration. (See *Yeh v. Suprior Court* (2023) 95 Cal.App.5th 264, 272 [nonsignatory defendant may invoke arbitration clause when claims against the nonsignatory are " ' "intimately founded in and intertwined" with the underlying contract obligations.' "].)

[8] To the extent plaintiffs assert Adani was directing Cornerstone entities to investigate qualified opportunity zone opportunities or participating in those projects, such claims would be subject to arbitration. However, we interpret the trial court's order as already compelling those claims to arbitration.

25

agreement regarding management of Cornerstone assets generally.[9] Accordingly, we consider whether the Cornerstone Management and CPSA entities' operating agreements require arbitration of these specific QOZ-related claims.

*Banc of California, National Association v. Superior Court* (2021) 69 Cal.App.5th 357, provides a useful analogy. In that case, the parties executed various loan documents, as well as entered into an aircraft usage agreement, but only the usage agreement contained an arbitration provision. (*Id.* at p. 369–370.) On appeal, the defendant argued all of the claims should be arbitrated because the loan documents and aircraft usage agreement were "interrelated." (*Id.* at p. 370.) The court disagreed, explaining "the question for the trial court was whether the parties' *dispute* related to the aircraft usage agreement. It did not. Nothing in the record . . . shows the breach of the loan documents was in any way related to the aircraft usage agreement . . . ." (*Ibid.*) The court further noted that while discounted prices under the usage agreement may serve as the "incentive" for the loans, "this does not show that the parties' dispute—over [defendant's] alleged breach of the loan documents—was in any way related to the aircraft usage agreement." (*Id.* at pp. 370–371.)

We reach a similar conclusion as to the claims involving QOF I, QOF II, and the QOZ entities. Kaufman received the funds at issue from the sale of properties held by Potrero Partners. Potrero Partners was not a Cornerstone entity, but a separate LLC owned by Kaufman and a third party. Likewise,

---

[9] Unlike the Nicalo note, which directly references Adani's role and duties as manager of Cornerstone SA, the claims regarding the QOZ entities do not reference Adani's role as a manager of a specific Cornerstone entity. Instead, those claims refer more generically to Adani's position of trust.

the sold properties were not owned by a CPSA entity or managed by Cornerstone Management.  While two QOZ entities eventually collaborated with a CPSA entity to develop a parcel of real estate, the allegedly improper ownership structure and funding of the QOZ entities is not "rooted" in the later real estate collaboration.  Rather, the claims involving QOF I, QOF II, and the QOZ entities are directly connected to the ownership and management structure established by those entities' operating agreements, and Adani's subsequent use of his authority under those operating agreements to transfer funds out of QOF II and assign himself allegedly disproportionate ownership percentages in the QOZ entities.

To the extent the QOZ allegations relate to conduct that occurred prior to Adani and Kaufman executing the operating agreements for QOF I, QOF II, and the QOZ entities, defendants have failed to meet their burden to prove an agreement to arbitrate.  A motion to compel arbitration requires an evidentiary showing.  (See *Rosenthal v. Great W. Fin. Sec. Corp.* (1996) 14 Cal.4th 394, 413.)  " '[B]ecause the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence.' " (*Theresa D. v. MBK Senior Living LLC* (2021) 73 Cal.App.5th 18, 24.)

Defendants argue the claims arise from Adani's role as Cornerstone Management's manager and reference the complaint's allegation that Cornerstone Management's operating agreement "purported to create an entity through which the other Cornerstone entities were to be managed." While complaint allegations can constitute judicial admissions that concede " ' "the truth of [the] matter," ' " we find this allegation insufficient.  (See *Shirvanyan v. Los Angeles Cmty. Coll. Dist.* (2020) 59 Cal.App.5th 82, 100.) This allegation only states what the operating agreement "purports" to do,

27

and then references "*the* other Cornerstone entities," without specification. (Italics added.) Use of the word "the" seems to suggest—at most—all existing Cornerstone entities, which would exclude QOF I, QOF II, and the QOZ entities because they had not yet been formed. Moreover, defendants' interpretation of this allegation appears to conflict with Adani's declaration, which states Cornerstone Management managed "Cornerstone *holdings*," an apparent reference the real property holdings.

We recognize the complaint also asserts Adani initially "used his position of trust and undue influence to induce" Kaufman to transfer his funds from Potrero Partners to QOF I and QOF II. Defendants argue this allegation can only refer to Adani's fiduciary duties as manager of Cornerstone Management. But this argument requires us to make assumptions unsupported by the record. For example, "position of trust" could refer to Adani's role as manager of Cornerstone II S, which provided Potrero Partners with its initial funding. And the Cornerstone II S operating agreement did not contain an arbitration provision and instead expressly vested exclusive jurisdiction in "the courts in Santa Clara County, California." The reference to "position of trust" could also relate to Adani's unspecified role in connection with Potrero Partners, which he claims as his basis for his $7.8 million "finder's fee." Or this phrase could relate to Kaufman and Adani's close friendship, including Adani serving as Kaufman's "personal advisor." Accordingly, reference to Adani using his position of trust and undue influence—without any connection to Adani's duties as manager of Cornerstone Management—is insufficient to trigger the arbitration provisions in the Cornerstone entities' operating agreements.

Finally, defendants argue the claims involving the QOZ entities are covered by the Cornerstone Management arbitration provision and/or the

28

CPSA arbitration provisions because the QOZ entities were created with the purpose of investing in properties already owned by the CPSA entities. But the alleged harm Kaufman suffered is not measured by or dependent on the later land agreements between the QOZ entities and the CPSA entities or Adani's management of those projects. Kaufman's claims are instead rooted in the structure and funding of QOF I, QOF II, and the QOZ entities.

While the arbitration provisions in the Cornerstone Management and CPSA entities' operating agreements are broad, they are not unlimited. The record does not evidence that the dispute regarding the structure and funding of QOF I, QOF II, and the QOZ entities is connected to Adani's role with Cornerstone Management and the CPSA entities Adani, not Cornerstone Management, is identified as the manager of QOF I, QOF II, and the QOZ entities. Because we reach this conclusion, we need not consider whether the QOZ entities have standing to compel arbitration as nonsignatories to the arbitration agreements.

In sum, the trial court properly denied defendants' petition to compel to arbitration plaintiffs' claims against Adani, QOF I, QOF II, and the QOZ entities related to these entities. This includes (1) the first through thirteenth, fifteenth, and eighteenth causes of action as against Adani, to the extent those claims arise from structuring and funding of QOF I, QOF II, and the QOZ entities and related conduct, and (2) the third, tenth through fourteenth, and sixteenth causes as against QOF I, QOF II, and the QOZ entities.[10]

---

[10] We reach this conclusion based on the allegations and record currently before this court. If plaintiffs subsequently assert that their claims regarding QOF I, QOF II, and the QOZ entities arise from Adani's role and duties as manager of Cornerstone Management, then this opinion should not

## IV. The Risk of Duplicative Litigation Does Not Justify Compelling Arbitration

Finally, defendants assert the trial court's order, which divides certain causes of action into arbitrable and nonarbitrable claims, "will lead to duplicative litigation, the risk of inconsistent rulings, and a waste of court and party resources." We disagree.

To the contrary, "[t]he proposition that a court should compel arbitration . . . merely to avoid duplicative litigation, is . . . simply wrong." (*Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, 233; see *ibid.* ["Parties who have not agreed to arbitrate may not be compelled to do so . . . ."].) Rather, courts are empowered to stay litigation and/or arbitration proceedings to avoid conflicting rulings on common issues. (See *Abaya v. Spanish Ranch I, L.P.* (2010) 189 Cal.App.4th 1490, 1497 [" 'While there is a strong public policy in favor of arbitration, there is an "equally compelling argument that the Legislature has also authorized trial courts to refuse enforcement of an arbitration agreement [or stay the arbitration] when, as here, there is a possibility of conflicting rulings." ' "]; *Fitzhugh v. Granada Healthcare & Rehab. Ctr., LLC* (2007) 150 Cal.App.4th 469, 475 [" 'the court, may, in its discretion, refuse to compel arbitration or may stay arbitration where "there is a possibility of conflicting rulings on a common issue of law or fact." ' "].) None of the cases defendants cite require arbitration of claims that are not subject to a valid arbitration provision, merely to avoid duplicative litigation.[11] (See, e.g., *Shaw's Supermarkets, Inc. v. United Food and*

_____

be interpreted as preventing defendants from filing a subsequent petition to compel such claims to arbitration.

[11] Defendants Adani and Nicalo assert the trial court erred by refusing to apply the Federal Arbitration Act (9 U.S.C. § 3 et seq.; FAA) to the 2003 Cornerstone SA arbitration provision and sustaining certain objections to

*Commercial Workers Union, Local 791, AFL-CIO* (1st Cir. 2003) 321 F.3d 251, 254 [considering whether to consolidate three "concededly arbitrable" grievances]; *Garden Grove Community Church v. Pittsburgh-Des Moines Steel Co.* (1983) 140 Cal.App.3d 251, 265 [addressing consolidation of "two agreements to arbitrate, each one of which is separately arbitrable."].)

Next, defendants argue the court's order is ambiguous as to which claims are compelled to arbitration and which remain in court. As an example, they reference allegations in the complaint regarding Adani's receipt of a $7.8 million "finder's fee" from Potrero Partners. However, the claims clearly challenge Adani's use of *Kaufman's* funds and the subsequent ownership and structuring of the QOZ entities.[12] To the extent such ambiguities exist regarding which claims within which causes of action are subject to arbitration, it appears to be an issue with the structure of the complaint and how the causes of action are framed. And the pending appeal does not encompass any challenges to the adequacy of the complaint.[13]

---

Adani's declaration. However, Adani and Nicalo only assert these points in arguing that claims arising out of that operating agreement should be compelled to arbitration. Because we have already concluded that provision is enforceable (see Part III.B.1., *ante*), we need not address these additional arguments.

[12] Separately, we also note Adani has not indicated plaintiffs' objections to his receipt of a finder's fee has any connection to any Cornerstone entity or associated operating agreement/arbitration provision.

[13] Defendants do not appear to contest the trial court's ability to split causes of action into separate claims, some of which are subject to arbitration. We agree this approach is appropriate to the extent the causes of action encompass multiple primary rights. (See *Galarsa v. Dolgen California, LLC* (2023) 88 Cal.App.5th 639, 653–654 ["California has a rule against splitting a cause of action." However, " 'a "cause of action" is comprised of a "primary right" of the plaintiff, a corresponding "primary duty" of the defendant, and a wrongful act by the defendant constituting a breach of that

Finally, defendants argue plaintiffs may seek to improperly utilize discovery through the court proceedings to benefit their arbitration claims. However, protective orders frequently contain provisions limiting the use of materials to certain proceedings. We are confident counsel is capable of managing this concern and will seek discovery orders as appropriate.

### DISPOSITION

The order is reversed in part and affirmed in part. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

---

duty.' "].) Much of the ambiguity raised by defendants could be potentially resolved by an amended pleading in which each cause of action only asserts a single primary right. We do not opine on this issue as it is not before this court.

_____
Petrou, J.

WE CONCUR:


_____
Tucher, P. J.


_____
Fujisaki, J.


A169221/*Kaufman et al. v. Adani et al.*